**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION (Dayton)**

| | | |
|---|---|---|
| **PLUMBERS & PIPEFITTERS LOCAL 572** | ) | **Case No. 1:03cv168** |
| **PENSION FUND, Derivatively on Behalf of** | ) | **(Consolidated Action)** |
| **Nominal Defendant PROVIDENT FINANCIAL** | ) | **Judge Walter Herbert Rice** |
| **GROUP, INC.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JACK M. COOK, *et al.*** | ) | |
| | ) | |
| **Defendants.** | ) | |

FIRST AMENDED CONSOLIDATED VERIFIED DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, CONSTRUCTIVE FRAUD,
GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST
ENRICHMENT, BREACH OF FIDUCIARY DUTY FOR INSIDER SELLING AND
MISAPPROPRIATION OF INFORMATION, AND FOR VIOLATIONS OF THE
SARBANES-OXLEY ACT OF 2002

## NATURE OF THE ACTION

1.     This is a consolidated shareholders' derivative action brought in the right of, and for the benefit of, nominal defendant Provident Financial Group, Inc. ("Provident" or the "Company"), against its entire Board of Directors and certain top officers, seeking to remedy defendants' breaches of their fiduciary duties and other violations of law which have inflicted millions of dollars in damages to Provident's reputation, goodwill and standing in the business community and have exposed it to millions of dollars in potential liability for federal securities laws violations.  The actions arise out of defendants causing Provident to file false financial statements between 1994 and 2003  (the "Relevant Period"), resulting in two massive earning restatements which have greatly damaged Provident's credibility, one of Provident's most precious assets as a financial institution. The first restatement, announced March 5, 2003, covered a record-setting six-year period beginning in 1997 and erased over $70 million of previously reported net income. The second restatement, announced April 15, 2003, erased an additional $44.4 million and covered an even longer period, 1994-2002.  These two restatements, which collectively represent one of the longest restatement periods in recent U.S. business history for a publicly-traded company, along with the false financial statements that defendants caused to be issued during the Relevant Period, have caused severe irreparable injury and damages to the Company's reputation and goodwill in the investment and business community.

## SUMMARY OF THE ACTION

2.     Provident is a commercial banking and financial services company offering full banking operations in Ohio, northern Kentucky, and southwestern Florida.  Provident also provides commercial financing, equipment leasing and mortgage lending at a national level.  Provident conducts its banking operations through The Provident Bank.  Additionally, Provident services loans and leases for other entities including approximately $5 billion worth of so-called "securitized," or off-balance sheet managed assets.

3.     Between January 14, 1998 and April 15, 2003, defendants caused Provident to issue numerous statements and file quarterly and annual reports with the Securities and Exchange Commission ("SEC") which falsely reported quarter after quarter of inflated earnings.  These results were achieved in large part by (1) by failing to record a liability in its sales/ leaseback transactions and (2) by improperly classifying these sales/leasebacks as the leasebacks of operating leases instead of capital leases in order to improperly account for these leases as off-balance sheet transactions, keeping billions of dollars in debt off its balance sheet.

4.     These positive but false statements had their intended effect.  Provident's stock traded as high as $55 during the Relevant Period.  Company insiders took advantage of this inflation, selling nearly $17 million worth of Provident stock at artificially inflated prices during the Relevant Period without disclosing that Provident's financial results were overstated as required by the "abstain or disclose" provisions of the federal securities laws.  For instance, after the restatement, Provident's Chief Financial Officer told The American Banker that, "[w]e knew the business wasn't super-profitable, and it looked like it was more profitable than it should be."  Many of these shares were obtained through the exercise of stock options that defendants caused the Company to grant them.  While these defendants were selling Provident stock into the market, they were also causing the Company to expend approximately $9 million repurchasing its own stock on the open market, further pushing up the stock price.

5.     As alleged herein, defendants also used the false financial reports to justify paying themselves millions of dollars in excessive unearned salaries and bonuses during the Relevant Period.   Though the Sarbanes-Oxley Act of 2002 requires disgorgement of any incentive compensation and/or insider trading proceeds following a restatement, defendants have recently disclosed in the Company's annual Proxy Statement that they will not part with bonuses or insider trading proceeds.  To the contrary, defendants decided, after the restatements were made, to pay the

Company's Chief Executive Officer (CEO) and its Chief Financial Officer (CFO), additional bonuses for 2002.  In his annual letter to shareholders, CEO Hoverson refers to 2002 as a "terrific" year, citing his management's "solid accomplishments of stabilizing our company."

6.      But 2002 was anything but a "terrific" year for Provident.  In two separate restatements announced less than six weeks apart, Provident restated its financial statements for 1994-2002, decreasing its net income by $114.7 million.  The restatement also caused Provident to include on its balance sheet billions of dollars and liabilities for which it had been accounting "off-balance sheet."[1]

7.      The restatements related to Provident's improper accounting for its leased vehicles. As a financial institution, Provident is involved in the vehicle leasing industry by providing auto leases to consumers ("Consumer Leases").  Provident's auto leases represent a large amount of Provident's assets.  At year-end 2002, $2.1 billion out of Provident's $17.5 billion in assets (or 12% of Provident's assets) were composed of Provident's auto leases.

8.      In connection with its Consumer Leases, Provident engaged in sales/ leasebacks transaction with investors, whereby Provident would sell its auto leases to investors and then immediately lease the vehicles back from the investors ("Investor Leases").  From 1997-1999, Provident engaged in nine of these sales/leasebacks.  Provident sought to account for these sales/leasebacks as "off-balance sheet" transactions.

9.      Provident's restatements are related to Provident's auto leases, including both its Investor Leases and its Consumer Leases.  Provident improperly accounted for its Investor Leases

---

[1]      Provident's restatement also brought onto its balance sheet billions of dollars of assets. However, the amount by which Provident's liabilities increased from the restatement exceeded the amount by which its assets increased.  For example, for year-end 2001, the restatement increased Provident's assets by $914 million.  It also *increased Provident's liabilities by over $1 billion* and decreased its retained earnings by $91 million.

- 3 -

entered into between 1997-1999 (1) by failing to record a liability in its sales/ leaseback transactions and (2) by improperly classifying these sales/leasebacks as the leasebacks of operating leases instead of capital leases in order to improperly account for these leases as off-balance sheet transactions, keeping billions of dollars in debt off its balance sheet. Further, Provident improperly accounted for its Consumer Leases by classifying them as direct-financing leases instead of operating leases in violation of GAAP. By using this improper method, Provident was able to recognize more income in the early years of the leases.

10.     On the news of the Company's massive restatements, representing what is clearly one of the longest, if not the longest, restatement period in recent U.S. business history, Provident's stock plummeted from approximately $28 per share in early March 2003, before the first restatement was announced, to below $22 per share on April 15, 2003 after the second restatement was announced, erasing more than $292 million worth of market capitalization, over 20% of the Company's value.

11.     As a direct result of this illegal course of conduct, the Company is now subject to numerous class action lawsuits filed in the United States District Court for the Southern District of Ohio, Western Division, on behalf of investors who purchased Provident shares during the Relevant Period. These class action lawsuits allege that investors purchased shares of the Company based on false and materially misleading statements regarding the financial condition of the Company, and that they have been significantly damaged thereby. Specifically, those actions allege that Provident: (i) materially overstated its operating results; (ii) operated without adequate internal controls, preventing it from being able to ascertain the true financial condition of the Company; and (iii) as a result of the foregoing, issued false and misleading financial statements.

12.     Also as a result of defendants' illegal actions, the goodwill and reputation of the Company has been severely damaged, which will make it difficult if not impossible to raise money needed to fund Provident going forward. The Company was immediately downgraded by both

Standard & Poors and Fitch.  Provident was put on review for cut by Moody's Investor Service.  All

three have challenged the Company's credibility and aggressive accounting and business practices:

- Standards & Poors said the ratings actions reflect a greater degree of uncertainty regarding Provident's ability to generate earnings of reasonably consistent quality: "This restatement of earnings occurs at a time in which Standard & Poor's has concerns about several of the company's credit risk exposures in the current economic environment.  Consequently, it is not as clear what the company core earnings capacity is at a time when the need to generate a predictable stream of income to absorb potential asset quality problems is critical."

- Fitch had previously assigned a Negative Rating Outlook to Provident on Jan. 21, 2003, noting concerns regarding continued high levels of problem assets and exposures to higher risk lending areas combined with a smaller reserve for loan losses.  The downgrades removed Provident from Rating Watch Negative but lowered its long-term and short-term ratings on the Company's debt, preferred stock, and deposits.

- Moody's stated that its downgrade review would examine the adequacy of Provident's restated core earnings in providing protection to creditors when related to Provident's current risk profile.  The review would also focus on Provident's systems and procedures, an area that Moody's stated it had erroneously perceived to have improved in recent years.

- Robert Hoverson, himself, Provident's Chief Executive Officer, admitted in a conference call with banking analysts on March 6, 2003 that "We accept this as a blow to our credibility," and that he expected regulators from the Federal Reserve Bank of Cleveland to act "relatively quickly."

13. The stock of Provident is registered with the SEC, trades in the United States and is

listed on the New York Stock Exchange ("NYSE").  Via the Sarbanes-Oxley Act of 2002, the U.S.

Congress mandated that public companies take action to increase and then maintain the increased

effectiveness of their internal disclosure, financial and accounting controls to prevent misstated

financial information, fraudulent conduct and the waste of corporate assets.  These requirements are

unique in all the world and reflect a unique policy of the United States regarding public companies

subject to our securities laws and were intended to improve corporate governance, to decrease the

possibility of directorial or management misconduct, thus increasing management accountability,

while safeguarding corporate assets and shareholder value.

14. On August 14, 2002, defendant Hoverson, as President and CEO, and defendant

Carey, as CFO of Provident, as required by the securities laws, signed and filed false certifications

on behalf of themselves and Provident with the SEC relating to Provident's Form 10-Q for 2Q '02 ending 6/30/02, which stated that the report was truthful, the financial statements in it were accurate, Provident's internal disclosure and accounting controls were designed to be effective to detect and prevent fraud and had been tested and found to be effective. Likewise, on November 14, 2002, CEO Hoverson and CFO Carey signed similar certifications required by Sarbanes-Oxley relating to Provident's Form 10-Q for 3Q '02 ending 9/30/02. Each of these certifications was false as the financial statements were false and Provident's internal disclosure and accounting controls were ill-designed, had not been tested and were not effective.

15. Provident's top executives and directors during 2000-2003 deliberately or recklessly allowed Provident's internal and financial controls to be deficient and defective. Prior and subsequent to the enactment of Sarbanes-Oxley, Provident's internal controls were grossly insufficient to assure compliance with GAAP, assure truthful and full disclosure by Provident to its shareholders and to protect and avoid the waste of Provident's assets.

16. From 1994 through 2002, Provident improperly accounted for its Investor Leases entered into between 1997-1999 (1) by failing to record a liability in its sales/ leaseback transactions and (2) by improperly classifying these sales/leasebacks as the leasebacks of operating leases instead of capital leases in order to improperly account for these leases as off-balance sheet transactions, keeping billions of dollars in debt off its balance sheet. Further, Provident improperly accounted for its Consumer Leases from 1994-2002 by classifying them as direct-financing leases instead of operating leases in violation of GAAP.

17. Defendants' fraudulent booking of its investor and consumer leases was only possible because of gross deficiencies in Provident's internal financial and accounting controls, which were in clear violation of the Sarbanes-Oxley Act of 2002. Defendants deliberately or recklessly allowed Provident to operate with internal and financial controls which did not comply with Sarbanes-Oxley

because to force compliance would have resulted in an end to defendants' scheme to falsify and inflate Provident's proved reserves and its financial statements, including Provident's reported net income. Provident's internal controls were grossly insufficient to assure proper booking of its investor and consumer leases.

18. The Sarbanes-Oxley Act placed significant additional responsibilities on the boards of directors of public companies subject to the Act, like Provident, to improved corporate financial, accounting and internal controls to improve corporate financial responsibility and disclosure. This new law was a disaster for the Provident Board, as, despite its public posture of concern over good corporate governance, controls, disclosure and integrity, it was sitting atop a massive ongoing scheme to falsify its Company's reported financial results. Any real compliance with Sarbanes-Oxley would have exposed this scheme, brought it to an end and resulted in embarrassing discharges. Thus, the Board of Provident did not enforce or comply with Sarbanes-Oxley, despite its legal obligation to do so. They will not sue themselves for these failures.

19. The Individual Defendants herein (as defined in ¶¶25-33), who are or were directors and/or officers of Provident, participated in this conspiracy to obtain the financial and social benefits of such positions for themselves, to enrich and further the personal and business interests of all defendants identified herein, to sell almost $17 million worth of stock at inflated prices and to allow all the Individual Defendants to maintain their positions of control at Provident so that they would not be sued for their wrongdoing. The directors who did not sell stock during the Relevant Period participated by approving Provident's false financial reporting and/or acted in reckless disregard of the Company's best interests, and are unwilling to sue to recover the insider trading proceeds. As a result of defendants' wrongful acts, the Company has suffered severe damage to its reputation, goodwill and its ability to conduct future operations.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2), in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs are citizens of the States of Tennessee and New York and all defendants are citizens of the State of Ohio. This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331 and supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

21.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

22.     Venue is proper in the Court because Nominal Defendant Provident is headquartered in  this District and thus a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the Defendants either resides in or maintains executive offices in this District and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

23.     Plaintiff Plumbers & Pipefitters Local 572 Pension Fund is a resident and citizen of the State of Tennessee.  All of its trustees are residents and citizens of the state of Tennessee. Plaintiff Peter Berg is a resident and citizen of the State of New York.  Plaintiff Plumbers & Pipefitters Local 572 Pension and Peter Berg are collectively referred to hereafter as "plaintiffs." Plaintiffs are and were at all relevant times complained of herein, shareholders of nominal defendant Provident.

24.     Nominal Defendant Provident is an Ohio corporation with its principal executive offices located at One East Fourth Street, Cincinnati, Ohio 45202.

25.     Defendant Robert L. Hoverson (hereinafter "Hoverson") was, at all relevant times, a director of Provident and its President and Chief Executive Officer (CEO) and Chairman of the

Executive Committee. Mr. Hoverson is a citizen of Ohio. As a director of Provident, Mr. Hoverson owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as CEO and Chairman of Provident's Executive Committee, Mr. Hoverson had also assumed important managerial responsibilities at Provident which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Mr. Hoverson owed to Provident and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Provident by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. In addition to his base salary of approximately $600,000 per year from 1998 through 2002, Mr. Hoverson received the following bonuses and stock options based on the Company's materially overstated financial performance during the Relevant Period:

| Year | Bonus | Number of Stock Options |
|------|-------|-------------------------|
| 1998 | $500,000 | 82,500 |
| 1999 | $550,000 | 65,000 |
| 2000 | $500,000 | 80,000 |
| 2001 | $0 | 90,000 |
| 2002 | $400,000 | 200,000 |
| **TOTAL** | $1,950,000 | 517,500 |

In addition, during the Relevant Period Defendant Hoverson sold 236,250 shares of stock, obtaining gross proceeds of $9,497,314.

26. Defendant Jack M. Cook (hereinafter "Cook") was, at all relevant times, a director of Provident and a member of its Audit Committee. Mr. Cook is a citizen of Ohio. As a director of Provident, Mr. Cook owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of Provident's Audit Committee, Mr. Cook had also assumed important managerial responsibilities at Provident which required him to be well informed about the day-to-day operations of the Company particularly, as a

member of the Audit Committee, with respect to, among others, (i) the Company's financial statements and its financial reporting process; (ii) the systems of internal accounting and financial control; (iii) the internal audit function; (iv) the annual independent audit of the Company's financial statements; and (v) the legal compliance and ethics programs as established by management and the Board.  Rather than fulfill these important fiduciary duties owed to Provident and its shareholders, Mr. Cook, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Provident by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  In April of 2001, Mr. Cook retired as President and Chief Executive Officer of Health Alliance of Greater Cincinnati, which included, *inter alia*, the Jewish Hospital, the same hospital where defendant Peerless is Chief Emeritus of the Otolaryngology Department.  Mr. Cook sold 3,375 shares of Provident stock on January 26, 2002 at $24 per share, obtaining gross proceeds of approximately $81,000.

27.    Defendant Thomas D. Grote, Jr. (hereinafter "Grote") was, at all relevant times, a director of Provident and a member of its Audit and Compensation Committees.  Mr. Grote is a citizen of Ohio.  As a director of Provident, Mr. Grote owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as a member of Provident's Audit and Compensation Committees, Mr. Grote had also assumed important managerial responsibilities at Provident which required him to be well informed about the day-to-day operations of the Company particularly, as a member of the Audit Committee, with respect to, among others, (i) the Company's financial statements and its financial reporting process; (ii) the systems of internal accounting and financial control; (iii) the internal audit function; (iv) the annual independent audit of the companies financial statements; and (v) the legal compliance and ethics programs as established by management and the Board.  Rather than fulfill these

important fiduciary duties owed to Provident and its shareholders, Defendant Grote, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Provident by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Mr. Grote sold 3,375 shares of Provident stock on April 22, 2002, at $31 per share, obtaining gross proceeds of approximately $104,625.

28.    Defendant Joseph A. Pedoto (hereinafter "Pedoto") was, at all relevant times, a director of Provident and a member of the Executive Committee and Chairman of the Compensation Committee.  Mr. Pedoto is a citizen of Ohio.  As a director of Provident, defendant Pedoto owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as a member of Provident's Executive and Compensation Committees, Mr. Pedoto had also assumed important managerial responsibilities at Provident which required him to be well informed about the day-to-day operations of the Company.  Rather than fulfill these important fiduciary duties Mr. Pedoto owed to Provident and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Provident by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Mr. Pedoto has served as President of JLM Financial, Inc., a financial consulting firm, since 1990.  Carl H. Lindner, Jr., Provident's over 40% controlling-shareholder, and his American Financial Corp. empire (which does substantial business with and owns substantial commercial paper of Provident) are substantial clients of JLM Financial, Inc.  Defendant Pedoto has engaged in other financial transactions with Mr. Lindner, including purchasing Mr. Linder's 26.7% interest in Circle K Corporation in 1992.  As Mr.  Lindner and his family are Provident's controlling shareholders and sold substantial stock at inflated prices during the Relevant Period, Mr. Pedoto

- 11 -

could not consider a demand to sue based on the allegations contained herein because it would jeopardize defendant Pedoto's relationship with Provident's controlling shareholder.

29.     Defendant Sidney A. Peerless (hereinafter "Peerless") was, at all relevant times, a director of Provident and a member of its Compensation Committee and served as a member of its Audit Committee from 1997 to February 2002.  Dr. Peerless is a citizen of Ohio.  As a director of Provident, Dr. Peerless owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.   Moreover, as a member of Provident's Compensation and Audit Committees, Dr. Peerless had also assumed important managerial responsibilities at Provident which required him to be well informed about the day-to-day operations of the Company particularly, as a member of the Audit Committee, with respect to, among others, (i) the Company's financial statements and its financial reporting process; (ii) the systems of internal accounting and financial control; (iii) the internal audit function; (iv) the annual independent audit of the companies financial statements; and (v) the legal compliance and ethics programs as established by management and the Board.  Rather than fulfill these important fiduciary duties owed to Provident and its shareholders, Defendant Peerless, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Provident by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Dr. Peerless is Chief Emeritus of the Otolaryngology Department of Jewish Hospital, the same hospital which is a part of the Health Alliance of Greater Cincinnati, which prior to April of 2001, Defendant Cook served as President and Chief Executive Officer.  Defendant Peerless sold 4,107 shares of Provident stock during the Relevant Period, obtaining gross proceeds of approximately $109,512.

30.    Defendant Joseph A. Steger (hereinafter "Steger") was, at all relevant times, a director of Provident and Chairman of its Audit Committee and a member of its Executive Committee.  Mr. Steger is a citizen of Ohio.  As a director of Provident, Mr. Steger owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as a member of its Executive Committee and Chairman of Provident's Audit Committee, Defendant Steger had also assumed important managerial responsibilities at Provident which required him to be well informed about the day-to-day operations of the Company particularly, as a member of the Audit Committee, with respect to, among others, (i) the Company's financial statements and its financial reporting process; (ii) the systems of internal accounting and financial control; (iii) the internal audit function; (iv) the annual independent audit of the companies financial statements; and (v) the legal compliance and ethics programs as established by management and the Board.  Rather than fulfill these important fiduciary duties owed to Provident and its shareholders, Mr. Steger, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Provident by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Defendant Steger was the President of the University of Cincinnati from 1984 until 2003, is currently President Emeritus and a faculty member at the University of Cincinnati  and is on the Board of Trustees of the University of Cincinnati Foundation. Provident provides substantial financial assistance to the University and is described as the University's "Marquee Sponsor."   In addition, the Lindner family provides substantial financial assistance to the University. The University's business school is named the Carl H. Lindner College of Business Administration and Defendant Steger is a professor of management in the business school. Indeed, Richard E. Lindner, Mr. Lindner's brother, has made significant contributions to the University including recently committing $10.2 million to the University's

Varsity Village athletic facilities that will bear his name. In addition, Carl H. Lindner, Jr., is an Honorary Trustee of the University of Cincinnati Foundation. As such, it would jeopardize Defendant Steger's personal, professional, and financial interests to authorize a suit against Provident's CEO and Board of Directors or Mr. Lindner, concerning their sales of Provident stock at inflated prices during the Relevant Period. Defendant Steger himself sold 3,275 shares of Provident stock during the Relevant Period, obtaining gross proceeds of $105,611.

31. Defendant Phillip R. Myers (hereafter "Myers") served as a director of Provident from 1982 until his retirement in 2002 and served as Executive Vice President of Provident from November 1998 until his retirement and served on the Executive Committee. Mr. Myers is a citizen of Ohio. As a director of Provident, Mr. Myers owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of Provident's Executive Committee, Defendant Myers had also assumed important managerial responsibilities at Provident which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Mr. Myers owed to Provident and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Provident by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, Mr. Myers sold 140,300 shares of inflated Provident stock, obtaining gross proceeds of nearly $6 million.

32. Defendant Christopher J. Carey (hereafter "Carey") has served as Executive Vice President and Chief Financial Officer (CFO) of Provident since November 19, 1998. Mr. Carey is a citizen of Ohio. As an officer of Provident, Mr. Carey owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.

Moreover, as CFO, Carey had also assumed important managerial responsibilities at Provident which required him to be well informed about the day-to-day operations of the Company particularly with respect to, among others, (i) the Company's financial statements and its financial reporting process; (ii) the systems of internal accounting and financial control; (iii) the internal audit function; (iv) the annual independent audit of the companies financial statements; and (v) the legal compliance and ethics programs as established by management and the Board.  Rather than fulfill these important fiduciary duties owed to Provident and its shareholders, Defendant Carey, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the Provident and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  In addition to his base salary of nearly $300,000 per year from 1999 through 2002, Defendant Carey received the following bonuses and stock options based on the Company's materially overstated financial performance during the Relevant Period:

| Year | Bonus | Number of Stock Options |
|---|---|---|
| 1998 | $0 | 40,000 |
| 1999 | $200,000 | 0 |
| 2000 | $300,000 | 30,000 |
| 2001 | $180,000 | 30,000 |
| 2002 | $240,000 | 70,000 |
| **TOTAL** | **$920,000** | **170,000** |

33.     Defendant Mark E. Magee  (hereafter "Magee") was, at all relevant times, Vice President, Secretary, and General Counsel.  Mr. Magee is a citizen of Ohio.  As an officer of Provident, Mr. Magee owed a duty to shareholders to be reasonably informed about the business and operations of the Company.  Moreover, Defendant Magee had also assumed important managerial responsibilities at Provident which required him to be well informed about the day-to-day operations of the Company.  Rather than fulfill these important fiduciary duties that Mr. Magee owed to the

- 15 -

shareholders of Provident he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Provident by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, defendant Magee sold 26,074 shares of Provident stock for proceeds of over $1.1 million. In addition to his base salary of nearly $187,000 per year from 1998 through 2002, Mr. Magee received the following bonuses and stock options based on the Company's materially overstated financial performance during the Relevant Period:

| Year | Bonus | Number of Stock Options |
|------|-------|-------------------------|
| 1998 | $77,000 | 8,900 |
| 1999 | $80,000 | 9,000 |
| 2000 | $84,000 | 10,000 |
| 2001 | $50,000 | 10,000 |
| 2002 | $50,000 | 17,500 |
| **TOTAL** | **$341,000** | **55,400** |

34.     The defendants identified above in ¶¶25-33 are collectively referred to hereinafter as the "Individual Defendants."  For demand futility purposes, the defendants identified in ¶¶25-30, who make up the current Board of Provident, are referred to as the "Current Director Defendants." The defendants identified above in ¶¶25-27, 29-31, 33 are referred to hereinafter as "Insider Selling Defendants."

## FACTS

35.     Provident is a commercial and banking services company with full service banking in Ohio, northern Kentucky, and southwestern Florida. The Company also provides commercial financing, equipment leasing and mortgage lending at a national level.

36.     On January 14, 1998, the Individual Defendants caused Provident to release its 1997 year-end results, reporting a 42% earning increase over fiscal 1996 on a 26% increase in revenues.

Thereafter, on April 14, 1998, the Individual Defendants caused Provident to file a Form 10-K with the SEC which reiterated these false financial reports. Between April 14, 1998 and April 15, 2003, the Individual Defendants caused Provident to issue numerous false statements concerning the Company's financial results and to file numerous false and misleading Forms 10-K and 10-Q with the SEC, including reporting the following false annual financial results:

|  | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| Net Income | $107 million | $122 million | $151 million | $73.6 million | $23.3 million |
| Assets | $7 billion | $8.1 billion | $10.5 billion | $13.9 billion | $15.7 billion |
| Liabilities | $6.5 billion | $7.4 billion | $9.6 billion | $12.7 billion | $14.8 billion |

37. On March 5, 2003, the Individual Defendants caused the Company to issue a press release entitled "Provident Financial Group, Inc. Announces Restatement of Operating Results for Years 1997 through 2002. The press release stated in relevant part:

> The restatement of previously reported operating results is attributed to errors in the accounting for nine auto lease financing transactions originated between 1997 and 1999.
>
> The errors that existed in the accounting for these transactions were first discovered by the company's finance staff in connection with the testing and installation of a financial model that identified differences in income that was originally recorded, compared with the income generated by the financial model. The company then notified its independent auditors and bank regulators and has reported all relevant information to its board of directors and audit committee. The company has been working closely with its independent auditors since the accounting errors were first discovered.
>
> ***A review of the accounting for the nine transactions also concluded that none of the transactions should have been reported off-balance sheet as a sale and lease back of operating leases. The appropriate accounting was to report the transactions as financing leases with all assets and balance sheets for the years 1997 through 2002 to include the nine auto lease financing transactions.*** (emphasis added).

38. On this news, trading in Provident shares plunged from approximately $28 per share to below $22 per share, erasing more than $292 million in market capitalization, over 20 percent of

the Company's worth, and representing the Company's biggest single-day stock drop in 14 years. The price of Provident stock continued to drop in subsequent days, eventually hitting a low of $21.36 per share on March 10, 2002.

39.    Due to less retained earnings over the past five years, the restatement reduced Provident's tangible book value by 7.3% (to $17.76), lowered its tangible equity-to-asset ratio from 5.6% to 4.9%, and reduced its reserve-to-loan ratio to 1.81%, from 1.91%.

40.    The Dow Jones Business News, on March 5, 2003, commented on the impact of the restatement in an article entitled "Provident's Restatement One for the Record Books," which stated in relevant part:

> ***Provident Financial Group Inc.'s earnings restatement is one for the record books – its six years worth of revisions is the longest continuous string of amendments in memory for a U.S. company.  But if history is any indication, Provident's problems are only just beginning.***
>
> The company's stock lost 20% on Wednesday, the day of the announcement by the Cincinnati banking company, but a study from New York University's Stern School of Business finds that the stocks of companies that announce restatements drop for three straight sessions on average.
>
> "Earnings restatements rewrite a company's history," generally in an unflattering way, said Min Wu of NYU's Department of Accounting, Taxation and Business Law, who conducted the study in conjunction with Softrax, whose software helps companies tally revenue.
>
> ***When companies restate earnings, and particularly when that's accompanied by a warning about future earnings - as was the case with Provident - there are usually reverberations, Wu said. "Analysts' downgrades, class-action lawsuits and management shuffles are not uncommon and they case a shadow over the firms, quite often for a long time."*** (Emphasis added).

41.    Indeed, the same day Standard & Poor's downgraded Provident's debt rating to below-investment-grade, or "junk" status.  The next day, March 6, 2003, Standard & Poor's downgraded Provident's credit rating from BBB- to BB-;  Lehman Brothers lowered its recommendation on Provident stock from equal-weight to underweight; and Fitch Ratings, in lowering Provident's debt rating to its lowest investment-grade rung, announced:

Fitch Ratings has downgraded and removed from Rating Watch Negative and long-term ratings of Provident Financial Group, Inc. (PFGI) and its affiliated to "BBB-" from "BBB." Individual ratings have been lowered to "C" from "B/C." In addition, the short-term ratings have been downgraded to "F3" from "F2." The Rating Outlook is stable. These rating actions follow PFGI's announcement yesterday of the restatement of earnings for years 1997 *through 2002, and lowered earnings guidance for 2003* ... Fitch had previously assigned a Negative Rating Outlook to PFGI on Jan.21, 2002, noting exposures to higher risk lending areas combined with a smaller reserve for loan losses. The restatements reduce historical levels of profitability by an aggregate of $70.3 million over the six years 1997 to 2002, as a previous accounting error underrepresented operating lease expense on nine auto lease financing transactions originated between 1997 and 1999. PFGI has also determined that the auto lease financing transactions should not have been accounted for as operating leases off balance sheet and has restated the balance sheet to include these transactions. A reduction in 2003 operating earnings is also expected, as the year had previously included higher earnings from these transactions. In addition, the restatements slightly weakened capital and capital rations.

42. In addition, after the restatement, analysts began questioning the Company's aggressive accounting. For example, a March 6, 2003 comment on Provident by Merrill Lynch stated: "We think the recent news will raise investor concerns about balance sheet strength and potentially aggressive accounting. It is also likely to heighten Provident's regulatory scrutiny and risk ...."

43. Analysts also attacked the credibility of Provident's management. In its March 6, 2003 comment in which it lowered Provident's rating to underweight, Lehman Brothers stated:

> *"We are troubled by the error and the severity of its impact, particularly because it undermines management's credibility. PFGI had demonstrated it was on the path to recovery with improving asset quality and decent earnings in 4Q02, but this announcement is a set back. The blow to confidence will linger, and in this challenging and uncertain environment, we believe investors should be wary with possible regulatory and ratings overhangs."* (Emphasis added).

44. Defendant Hoverson, in a March 5, 2003 conference call, admitted the impact of the restatement on the Company: *"We accept this as a blow to our credibility, as a serious issue. It is a step backward and we deeply regret it happened."* (emphasis added). In a March 6, 2003 interview with The American Banker, defendant Carey admitted, *"We knew the business wasn't super-profitable, and it looked like it was more profitable than it should be."* (emphasis added).

45. After the first restatement, the Individual Defendants caused the Company to expend funds to initiate an internal investigation and the Audit Committee was forced to hire the accounting firm of PricewaterhouseCoopers LLP to conduct an independent review of the Company's restatement.

46. The Dow Jones Business News was correct in predicting that Provident's first restatement was only the beginning of the Company's troubles. Indeed, notwithstanding defendant Hoverson's assurances to the contrary, the Company, just a little over a month after the first restatement and Mr. Hoverson's comments, announced the Company would be restating again – this time all the way back to 1994. On April, 15 2003, defendants caused the Company to issue a press release entitled "Provident Financial Group, Inc. Announces Additional Restatement of Operating Results." The press release stated in relevant part:

> Provident Financial Group, Inc., the parent company of The Provident Bank, announced today an additional restatement of operating results. On March 5, 2003, the company announced it was restating operating results for the years 1997 through 2002, that restatement was attributed to errors in the accounting for nine auto lease financing transactions originating between 1997 and 1999.
>
> *     *     *
>
> Provident has now determined that its auto leases, which it has historically classified as direct finance leases and reported in the loan category, do not meet the requirements for direct finance lease classification under Financial Accounting Standards No. 13, titled "Accounting for Leases." Since 1994, an important factor the company has relied upon in determining the classification of its auto lease portfolio has been its residual value insurance. In general, the company has obtained residual value insurance for its auto leases on a pool basis by year of origination. This insurance is commonly referred to as "capped" insurance. The company has now determined that this type of insurance coverage, while effective in removing residual risk, does not result for accounting purposes in direct finance lease classification for its auto leases.
>
> As a result, Provident will reclassify all of the auto leases on its balance sheet as operating leases and report them as leased equipment, instead of direct finance leases, which are currently reported in the loan category. The reclassification will affect auto leases originated from 1994 through 2002. During this period, the company's auto lease originations totaled $4.7 billion and had a remaining balance of $2.1 billion at December 31, 2002

*As a result of the reclassification, Provident will restate amounts of income recognized under its leases for prior years. The aggregate restatement amount is $44.4 million, after-tax, for the years 1994 through 2002. This amount is in addition to the restatement amounts announced by the company on March 5, 2003. As a result of the restatements, the company's earnings for the year ended December 31, 2002 were $95.5 million or $1.88 per share compared with a loss of $1.0 million or 4 cents per share for the year ended December 31, 2001.* (emphasis added).

47.     After the Company's announcement of its second restatement in less than two months, with the restatement now encompassing an eight-year period, and clearly one of the longest, if not the longest, in recent U.S. business history for a publicly traded company, the investment community was not nearly so forgiving. An April 16, 2003 article in the Cincinnati Enquirer by James McNair entitled "Provident reports phantom profits: $44.4 million more found booked improperly," quoted Evan Momios, a Standard & Poor's equities analyst:

*"I think the second restatement is a blow to their credibility," said Momios, who has a hold on Provident shares. "I think its going to take some time for management to regain investors' trust."* (emphasis added).

48.     In addition, an April 15, 2003 Company Update on Provident by Lehman Brothers, entitled "Restating the Restatement," commented in relevant part:

*Even though there is no cash effect, this additional restatement is not a positive sign. We continue to believe that these problems may raise concerns for regulators – not about these leases in particular but more generally about PFGI, perhaps having an impact on an unrelated business. This may not be the last shoe to drop, so to speak.* (emphasis added).

49.     On March 14, 2003, Duncan Wood with www.ERisk.com wrote an article titled "Model Risk on the Rise?" and commented on the Provident fiasco:

Provident Financial Group last week announced that a modeling error in its auto-leasing business would lead to a major restatement of its operating results for the five years up to 2002. Provident explained that an error made in a valuation model way back in 1997 had only just been uncovered, as well as inappropriate accounting treatment for the nine auto-lease financing transactions involved.

\*       \*       \*

Instead, Provident seems to have made a different mistake. When its finance staff began rolling out a new financial model this year, they discovered substantial

- 21 -

differences between model-generated income figures for nine transactions used to finance its auto-leasing business and those that had actually been reported between 1997 and 2002. That led to the $67 million earnings restatement announced on March 5 - an 18% reduction - as well as a sharp cut in expected earnings for this year. The bank also said the nine transactions had also been treated incorrectly in its accounts, deciding that they should have been recorded on, rather than off, its balance sheet. That meant its assets had been underreported by some $813 million at the end of 2002, and its capital ratio overstated by nearly fifty basis points...

* * *

The root cause appears to have been a modeling error made when the first transaction was originally valued, subsequently incorporated into the valuations of the following eight transactions (but not those of similar transactions made after 2000). Provident CFO Christopher Carey told the New York Times that his bank had incorrectly estimated the amount of interest payable to investors who helped fund the auto leases over the eight-year term of each of the nine deals....

* * *

Others agree that the error itself may be forgivable, but find it hard to understand how the problem could go undetected since 1997. "They had to move [more than] $800 million in assets back onto the balance sheet - this was a sizeable chunk of business. Mistakes happen, but how could it go on for five or six years?" asks Bert Ely, a banking consultant based in Alexandria, Virginia....

50. The Individual Defendants, particularly the members of the Audit Committee, were responsible for maintaining and establishing adequate internal controls for Provident and to ensure that the Company's financial statements were based on accurate financial information. According to the corporate accounting standards applicable to Provident, known as the Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required under GAAP, to:

    1.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

    2.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

    (a)    transactions are executed in accordance with management's general and specific authorization;

(b)  transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

51.  In addition, according to Appendix D to the Statement on Auditing Standards ("SAS") No. 55, management should consider, among other things, such objectives as: (a) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (b) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

52.  According to SAS 55.13:

Establishing and maintaining an internal control structure is an important management responsibility.  To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

53.  Provident's Proxy Statement filed on April 3, 2002 discloses that:

The Audit Committee is responsible for reviewing with the independent auditors the plans and results for he audit engagement of Provident and reviewing the scope and results of the procedures for internal auditing.

The Committee is authorized generally to superintend the administration of the Internal Audit Department, which has the responsibility to perform internal audit functions for Provident and its subsidiaries.  The Board has adopted a charter for the Audit Committee, which was attached to our 2001 Proxy Statement.

54.  Provident's Audit Committee Charter provides:

AUDIT COMMITTEE CHARTER
PROVIDENT FINANCIAL GROUP, INC.

*Organization*

This charter governs the operations of the Audit Committee.  The Committee shall review and reassess the charter at least annually and obtain the approval of the Board of Directors.  The Committee shall be appointed by the Board of Directors and shall be comprised of at least three directors, each of whom is independent of management and the company.  Members of the Committee shall be considered independent if they have no relationship that may interfere with the exercise of their independence

from management and the company.  All Committee members shall be financially literate, (or shall become financially literate within a reasonable period of time after appointment to the Committee) and at least one member shall have accounting or related financial management expertise.

Statement of Policy

***The Audit Committee shall provide assistance to the Board of Directors in fulfilling their oversight responsibility to the shareholders, potential shareholders, the investment community, and others relating to the company's financial statements and the financial reporting process, the systems of internal accounting and financial controls, the internal audit function, the annual independent audit of the companies financial statements, and the legal compliance and ethics programs as established by management and the Board.***  In so doing, it is the responsibility of the Committee to maintain free and open communication between the Committee, independent auditors, the internal auditors and management of the company.  In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention, with full access to all books, records, facilities, and personnel of the company and the power to retain outside counsel, or other experts for this purpose.

***Responsibilities and Processes***

***The primary responsibility of the Audit Committee is to oversee the company's financial reporting process on behalf of the Board and report the results of their activities to the Board.***  Management is responsible for preparing the company's financial statements, and the independent auditors are responsible for auditing those financial statements.  The Committee in carrying out its responsibilities believes its policies and procedures should remain flexible, in order to best react to changing conditions and circumstances.  ***The Committee should take the appropriate actions to set the overall corporate "tone" for quality financial reporting, sound business risk practices, and ethical behavior.***

The following shall be the principal recurring processes of the Audit Committee in carrying out its oversight responsibilities.  The processes are set forth as a guide, with the understanding that the Committee may supplement them as appropriate.

- The Committee shall have a clear understanding with management and the independent auditors that the independent auditors are ultimately accountable to the Board and the Audit Committee, as representatives of the company's shareholders. The Committee shall have the ultimate authority and responsibility to evaluate and, where appropriate, replace the independent auditors.  The Committee shall discuss with the auditors their independence from management and the company and the matters included in the written disclosures required by the Independence Standards Board. Annually, the Committee shall review and recommend to the Board the selection of the company's independent auditors, subject to shareholders' approval.

- The Committee shall discuss with the internal auditors and the independent auditors the overall scope and plans for their respective audits including the adequacy of

staffing and compensation. ***Also, the Committee shall discuss with management, the internal auditors, and the independent auditors the adequacy and effectiveness of the accounting and financial controls, including the company's system to monitor and manage business risk, and legal and ethical compliance programs.*** Further, the Committee shall meet separately with the internal auditors and the independent auditors, with and without management present, to discuss the results of their examinations.

- The Committee shall require the independent auditor's review of the company's quarterly financial statements prior to the filing of the 10-Q. The Committee will review items brought forward by the independent auditor.

- The Committee shall review with management and the independent auditors the financial statements to be included in the company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of Form 10-K), including their judgment about the quality, not just acceptability, of accounting principles. Also, the Committee shall discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards.

(Emphasis added.)

55. The fact that Provident restated its financial statements for fiscal 1994 through 2002, a period of **eight years** and possibly beyond, is an admission that the financial statements originally issued were false when issued and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Provident was to correct material errors in Provident's previously issued financial statements. *See* APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No. 20, ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, a change in accounting principles used or to correct an error in previously issued financial statements. Provident's restatement was not due to a change in reporting entity or a change in accounting principles, but rather, to errors in previously issued financial statements. Thus, the restatement is an admission by Provident that its previously issued

financial results and its public statements regarding those results were false and misleading when made.

56.     In two separate restatements announced less than six weeks apart, Provident restated its financial statements for 1994-2002, decreasing its net income by $114.7 million. The restatement also caused Provident to include on its balance sheet billions of dollars and liabilities for which it had been accounting "off-balance sheet."[2]

57.     The restatements related to Provident's improper accounting for its leased vehicles. As a financial institution, Provident is involved in the vehicle leasing industry by providing auto leases to consumers. Provident's auto leases represent a large amount of Provident's assets. At year-end 2002, $2.1 billion out of Provident's $17.5 billion in assets (or 12% of Provident's assets) were composed of Provident's auto leases.

58.     In connection with its Consumer Leases, Provident engaged in sales/ leasebacks transaction with investors, whereby Provident would sell its auto leases to investors and then immediately lease the vehicles back from the investors. From 1997-1999, Provident engaged in nine of these sales/leasebacks. Provident sought to account for these sales/leasebacks as "off-balance sheet" transactions.

59.     Provident's restatements are related to Provident's auto leases, including both its Investor Leases and its Consumer Leases. Provident improperly accounted for its Investor Leases entered into between 1997-1999 (1) by failing to record a liability in its sales/ leaseback transactions and (2) by improperly classifying these sales/leasebacks as the leasebacks of operating leases instead

---

[2]     Provident's restatement also brought onto its balance sheet billions of dollars of assets. However, the amount by which Provident's liabilities increased from the restatement exceeded the amount by which its assets increased. For example, for year-end 2001, the restatement increased Provident's assets by $914 million. It also ***increased Provident's liabilities by over $1 billion*** and decreased its retained earnings by $91 million.

of capital leases in order to improperly account for these leases as off-balance sheet transactions, keeping billions of dollars in debt off its balance sheet. Further, Provident improperly accounted for its Consumer Leases by classifying them as direct-financing leases instead of operating leases in violation of GAAP. By using this improper method, Provident was able to recognize more income in the early years of the leases. The impact of the restatement is shown below:

### Effect of Restatement on Assets

| (billions of $) | 2000 | 2001 | 1Q 2002 | 2Q 2002 | 3Q 2002 |
|---|---|---|---|---|---|
| As Originally Reported | $13.9 | $15.6 | $15.3 | $15.7 | $16.2 |
| As Restated | $15.0 | $16.6 | $16.3 | $16.6 | $17.0 |
| Difference Inc./(Dec.) | $1.1 | $1.0 | $1.0 | $0.9 | $0.8 |

### Effect of Restatement on Long-Term Debt

| (billions of $) | 2000 | 2001 | 1Q 2002 | 2Q 2002 | 3Q 2002 |
|---|---|---|---|---|---|
| As Originally Reported | $2.8 | $2.9 | $2.9 | $2.9 | $3.0 |
| As Restated | $4.0 | $4.0 | $3.9 | $3.9 | $4 |
| Difference Inc./(Dec.) | $1.2 | $1.1 | $1.0 | $1.0 | $1.0 |

### Effect of Restatement on Net Income

| (millions of $) | 2000 | 2001 | 1Q 2002 | 2Q 2002 | 3Q 2002 |
|---|---|---|---|---|---|
| As Originally Reported | $73.6 | $23.3 | $27.3 | $29.8 | $30.4 |
| As Restated | $56.5 | ($1.0) | $21.6 | $23.2 | $24.0 |
| Difference Inc./(Dec.) | ($17.1) | ($24.3) | ($5.7) | ($6.6) | ($6.4) |

### Effect of Restatement on EPS

| | 2000 | 2001 | 1Q 2002 | 2Q 2002 | 3Q 2002 |
|---|---|---|---|---|---|
| As Originally Reported | $1.46 | $0.46 | $0.54 | $0.58 | $0.60 |
| As Restated | $1.12 | ($0.04) | $0.43 | $0.46 | $0.47 |
| Difference Inc./(Dec.) | ($0.34) | ($0.50) | ($0.09) | ($0.12) | ($0.13) |

**Provident's securitization transactions from 1997-1999**

60.     In connection with its auto leases, Provident engaged in securitization arrangements involving the sale/ leaseback of its Consumer Leases with investors.  Between 1997 and 1999, Provident entered into nine securitization transactions.

61.     Securitization is the process by which financial assets are transformed into negotiable securities.  A company will aggregate or pool a group of similar assets such as loans or mortgages (in this case vehicle leases) and place them in a trust.  Thereafter, the trust then sells the negotiable securities for which the loans or leases serve as collateral.  Only if structured correctly can the assets and liabilities associated with the securitization transaction be removed from a company's balance sheet.

62.     A company may enter into a securitization arrangement as opposed to entering into a secured financing arrangement only if certain conditions are met.  In a secured financing arrangement, a company borrows funds and the loans or leases serve as collateral (it is similar to a mortgage where the mortgage is secured by the house).  In order for a transaction to be considered a securitization arrangement, it must reflect a "true sale" as opposed to a financing arrangement. Under Statement of Financial Accounting Standards ("SFAS") No. 125, *Accounting for Transfers and Serving of Financial Assets and Extinguishment of Liabilities,*[3] a securitization transaction may only be considered for off-balance sheet treatment if the company has surrendered control, effectively, as well as legally, over the assets, and the assets have been isolated from the company

---

[3]     This statement became effective for all applicable transactions entered into after December 31, 1996.  It was later superseded by SFAS No. 140, which was effective for all applicable transactions entered into after March 31, 2001 and for all disclosures relating to securitization transactions for fiscal years beginning after December 15, 2000.  Therefore, SFAS No. 125 is the standard applicable to the securitization arrangements entered into between 1997 and 1999.

and its creditors, even in the event of bankruptcy.  If any of the above are not met, then the company must account for transaction as secured borrowing.  SFAS No. 125 ¶¶15, 47-58.

63.     The nine securitization transactions Provident entered into from 1997-1999 were structured as follows:

- Lease of a vehicle to consumers for a term ranging from 48 to 72 months ("Consumer Leases");

- The sale of the vehicles to an investor(s) in a pooled transaction at or subsequent to the commencement of the consumer leases;

- Concurrent lease-back of the vehicles from the investor(s) for a term of 96 months or 8 years ("Investor Lease"); and

- Because the two leases were not of equal length, the transaction included a like-kind-exchange feature (as defined by the Internal Revenue Code).  As a result, Provident was allowed to substitute a like-kind vehicle into the pool for any vehicle that left the pool as a result of either early termination or full-term amortization of the underlying consumer lease.  Accordingly, investors retained the depreciation benefits and further retained the cash flows available per the leaseback over the full 96-month term of the vehicle leaseback.

64.     The following illustration shows the structure of these transactions:

STRUCTURE OF SECURITIZATION TRANSACTIONS
FROM 1997 - 1999



65.     In these securitization transactions, Provident, as shown above, entered into two leasing transactions.  Under the Investor Leases (the leaseback portion), Provident was the lessee of

- 29 -

the vehicles and under the Consumer Leases, Provident was the lessor of the vehicles.  Pursuant to

GAAP, there are different methodologies used in accounting for leases available to lessees and to

lessors.  SFAS No. 13, *Accounting for Leases*, ¶6.  Below is a table showing the different methods

available to Provident as the lessee in its Investor Leases and the methods available to Provident as

the lessor in its Consumer Leases.

| Methods available to Provident as Lessee in Investor Lease | Methods available to Provident as Lessor in Consumer Lease |
| --- | --- |
| Capital Lease | Direct-Financing Lease |
| Operating Lease | Operating Lease |

**Provident's Improper Accounting for Investor Leases**

66.    Provident has admitted its accounting for Investor Leases in the securitization

transactions entered into between 1997 and 1999 consisted of (1) improperly failing to record a

liability and of (2) improperly classifying its leases as operating leases as opposed to capital leases

and by accounting for these leases in off-balance sheet arrangements.

67.    First in connection with its Investor Leases, Provident failed to record a liability

related to an early buy-out ("EBO") option provided for in the securitization transactions.  All but

one of the nine transactions provided Provident with an EBO option.  The EBO permitted Provident

to terminate the sale/lease-back agreement after 6 years and purchase the leased vehicles back for a

predetermined percentage of the original vehicles costs.  Provident intended to exercise the EBO

option on each of its transactions.  As a result, these Leases did not qualify as an operating lease.

68.    Provident improperly accounted for its EBO options at the inception of the Investor

Leases by failing to record liabilities associated with the EBO options.  Provident accounted for

these securitization transactions using an internally generated model to forecast cash flows.  This

model had certain limitations which became known to Provident at least as early as March of 2000.

Despite knowing the defects associated with the model, Provident failed to take any form of

substantive corrective action concerning the model until its initial restatement in March of 2003 –
three years later.

69.     It was not until the first EBO option was coming due in September of 2003, at a time
when Provident needed accurate information in order to decide whether or not to exercise the EBO
option, that Provident properly analyzed the EBO option.  What Provident discovered was that the
EBO price would in fact be greater than the fair market value of the leased vehicles that would be
returned to Provident's balance sheet upon exercise of the EBO.  In light of this short-fall between
the fair market value and the EBO price, under GAAP Provident was required to record the
difference between the EBO price and the fair market value as a liability at the inception of the
transaction.  SFAS No. 13 ¶¶32-33.

70.     Next, in connection with its Investor Leases, Provident improperly classified the
Investor Leases as operating leases and accounted for them as off-balance sheet securitizations.
However, in light of certain structural elements, the transactions did not qualify as a "true sale."
These structural elements include the following: limitations of the transferability of the purchased
asset by the investor buyers, the existence of the EBO and the like-kind feature, which allowed
Provident to substitute a like-kind vehicle for one leaving the pool early.  Consequently, Provident
did not meet the requirements to account for these transactions as off-balance sheet securitizations
and thus was required to account for these financial arrangements on its balance sheet.

71.     Furthermore, the Investor Leases qualified as capital leases and not operating leases.
GAAP requires that from a lessee's position a lease which meets any one of four criteria be treated
as capital leases.  *See* SFAS No. 13, ¶¶6(a), 10.  The four criteria are as follows:

    (a)     leases transferring ownership;

    (b)     leases with a bargain purchase options;

    (c)     leases with lease terms equal to 75% or more of the economic life (75% test);

(d)      leases where the present value of the contractual lease payments and any guaranteed portion of the residual value is equal to 90% or more of the fair market value (90% test).

72.      A lease that does not qualify as a capital lease is an operating lease.  SFAS No. 13 ¶¶6, 32-33.  Provident incorrectly accounted for the Investor Leases as operating leases instead of capital leases.  Many of Provident's Consumer Leases contained a provision in which the consumer was granted an option to purchase a vehicle.  Accordingly, these options provided Provident with an economic compulsion to buy the vehicle back from the lessor in order to meet its obligation to each consumer with whom it had granted such a purchase option.  In light of the fact that Provident would be buying the vehicles back from the Investors, it qualified as a capital lease.

**Restatement Attributable to Consumer Leases**

73.      On April 5, 2004, Provident announced its second restatement, in which it admitted that its accounting for Provident's Consumer Leases from 1994-2002, including the nine securitization transactions from 1997-1999, were improper.  In the Consumer Leases, Provident was the lessor.  Under GAAP, there are three main types of methods of accounting for leases by a lessor: (1) sales-type method, (2) direct-financing method, and (3) operating method.  SFAS No. 13 ¶6.  As the lessor, Provident accounts for its leases either under the direct-financing method or the operating method.

74.      Here, from 1994-2002, Provident accounted for its vehicle leases under the direct-finance method and reported them as loans on its balance sheet.  In its restatement, Provident announced that its accounting for these leases was incorrect under standard accounting rules.  Accordingly, these leases would be reclassified as operating leases and reported as leased equipment on its balance sheet.  By classifying its auto leases as direct-financing leases, Provident gained a significant advantage by being able to recognize a greater amount of income in the early years of the

leases as opposed to the more even recognition of income available to the company if the leases had been classified as operating leases.

**Provident's Leases did Qualify for Direct Financing Lease Accounting Because the Leases Did Not Exceed 90% of the Fair Market Value of the Leased Asset at the Inception of the Lease**

75.     In order to be classified under the direct-financing method, the lease must meet any one of the criteria set forth above for the capital lease method (available to lessees). SFAS No. 13 ¶¶6-8. Additionally, a direct-financing lease must meet the following two other criteria:

(a)     collectibility of payments must be reasonably assured; and

(b)     no important uncertainties exist regarding future costs to be incurred.

76.     A lease that does not qualify as a direct-financing lease or a sales-type lease is an operating lease. SFAS No. 13 ¶6.

77.     Provident classified its leases as direct-financing leases under the 90% test, which holds that if the present value of the contractual lease payments and any guaranteed portion of the residual value (*i.e.* portions guaranteed by third parties such as insurers) equals or exceeds 90% of the fair market value of the leased asset at the inception of the lease, then it is a direct-financing lease. Typically unguaranteed residual values that are greater than 10% of original costs diminish a company's ability to classify a lease as a direct-financing lease. Despite the fact that Provident's unguaranteed residual values on its auto leases was traditionally in the 40% range, Provident improperly accounted for its Consumer Leases as direct-financing leases in violation of GAAP.

78.     Provident improperly determined that it was able to meet the 90% test based upon its RVI policies. This determination was improper because of both the policy caps provided for in the policies and the pooled nature of the policies themselves.

79.     First, Provident's RVI policies cap the guaranteed portion of the residual value at 25%. In light of Provident's residual values typically being in the 40% range, this means that at least

15% or more of the residual value was unguaranteed. This unguaranteed portion is over 10%, thus precluding Provident from classifying these leases as direct-financing leases.

80.     Second, Provident insures its residuals values on a pooled basis (by year of lease inception) rather than on a vehicle-by-vehicle basis. The policies do not take affect unless the pool or portfolio as a whole experiences a net loss. Therefore, individual losses on vehicles will be offset against individual gains on other vehicles. Only an overall net loss on a pool of assets will be subject to the guarantee. Under GAAP, each lease is classified at its inception. SFAS No. 13 ¶¶6-9. The pooled nature of Provident's RVI Policies make it difficult for Provident to determine the amount of the guaranteed payments that would be attributable to a particular lease at the inception of the lease as the effect of the policy can only be determined after settlement of the policy. In light of the uncertain and contingent nature of the amount of the guarantee available to a particular lease, the guarantee can not be included in determining the 90% test, thus leaving the total unguaranteed residual value for each lease in the 40% range and precluding Provident from classifying these leases as direct-financing leases.

**Provident Improperly Accounted for the Leases as Direct-financing Leases Instead of Operating Leases**

81.     In its second restatement, Provident admitted that it improperly accounted for its Consumer Leases, classifying them as direct-financing leases as opposed to operating leases. The major difference between the two methodologies is that under the direct-financing method, the amount of income that is recognized steadily declines as the loan balance declines over the life of the lease whereas under the operating lease the amount of income that is recognized remains constant throughout the life of the lease.

82.     Under the direct-financing method, a lease is recorded as a loan in the asset section of the balance sheet. On the balance sheet, the amount recorded as the asset is the gross investment net of unearned income. The gross investment is the sum of (1) the present value of the lease payments

and (2) the estimated residual value of the leased property. The difference between the gross investment and the fair market value of the leased property at the inception of the lease is the unearned income. Unearned income is amortized over the life of the lease and reflected as interest income in the income statement. SFAS No. 13 ¶18. A direct-financing lease is the equivalent of a loan. The amount of income recognized under this method steadily declines over the life of the lease as the lease balance declines. It is similar to a mortgage. In a mortgage a person will make a monthly payment, which consists of both the payment of interest and the repayment of the principle. In the early years of the mortgage, the interest portion of the monthly payment is higher then in the later years of the mortgage.

83.     Under the operating method, the lease is recorded as a fixed asset in the asset section of the balance sheet. It is shown as leased equipment less accumulated depreciation. On the income statement, a company will report rental revenue less expenses to obtain profit. The full amount of the lease payment is recorded as rental revenue while the related depreciation expense is record as an expense. The result is a straight-line recognition of income from the lease. SFAS No. 13 ¶19.

84.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

> The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

> The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶ 34);

> The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶ 40);

- 35 -

The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶ 42);

The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant in a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶ 79); and

The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what is purports to represent (FASB Statement of Concept No. 2, ¶¶ 95, 97).

85.     The Individual Defendants not only caused the Company to violate GAAP, but also caused the Company, particularly the Audit Committee, to violate its own Audit Committee Charter by failing to, among others, properly implement, review, and oversee: (i) the Company's financial statements and its financial reporting process; (ii) the systems of internal accounting and financial control; (iii) the internal audit function; (iv) the annual independent audit of the Company's financial statements; and (v) the legal compliance and ethics programs as established by management and the Board. The sheer magnitude of the length of the restatement period, *eight years*, evidences that the Individual Defendants, and particularly the Audit Committee, utterly failed to establish and maintain adequate internal controls for Provident to ensure that the Company's

financial results were calculated and recorded in accordance with GAAP, despite the fact the Audit Committee met 33 times between 1998-2002.

86. The Individual Defendants' false statements throughout the Relevant Period enabled certain of the Individual Defendants to obtain millions of dollars of excessive, unearned compensation, which was based in large part on Provident's reported "results of operations." Between 1997 and 2002, Defendant Hoverson received in excess of $3.4 million in salary, almost $2.4 million in bonuses and stock options to buy hundreds of thousands of shares of Provident stock. During the Relevant Period, Mr. Hoverson disposed of 158,450 shares realizing nearly $6 million in profits. While Defendant Hoverson was selling into the market, he caused Provident to repurchase $8.65 million and $246,000 worth of its own stock on the open market in 1999 and 2001 respectively. The rest of the Individual Defendants also received tens of thousands in compensation and thousands of stock options, many of which, as detailed in ¶¶26-33, were exercised during the Relevant Period while Provident's stock was artificially inflated.

87. By issuing these materially false and misleading statements, or acquiescing in their dissemination and publication, the Individual Defendants breached their fiduciary duties of loyalty and good faith, violated GAAP, violated the Company's own Audit Committee Charter, committed gross mismanagement, and abused their control of Provident, by knowingly, recklessly, willfully, intentionally, and/or in the absence of good faith:

> Causing Provident to engage in the willful violation of the federal securities laws and to thereby engage in the fraud alleged herein;

> Failing to supervise adequately and concealing from the public the true facts concerning the financial and operational condition of Provident, specifically in regard to the operations of the Company during the Relevant Period;

> Failing to adequately supervise the operations of Provident in a manner consistent with preventing deceptive practices such as the accounting fraud complained of herein;

Failing to supervise adequately the officers and employees of Provident and failing to ensure that they act with honesty and integrity in order to preserve and enhance Provident's reputation in the business community;

Exposing Provident to potential liability of millions of dollars, as well as lost goodwill as a result of their failure to supervise adequately Provident's operations and employees and to prevent their illegal activity;

Failing to institute legal action against those responsible for causing Provident to engage in the deceptive practices in violation of state and federal securities laws and thereby exposing Provident to liability and other financial injury resulting therefrom;

Causing the Company to be liable for the defense and indemnification of those directors and officers responsible for exposing Provident to liability in the above-mentioned securities class actions and other actions;

Failing to ensure that Provident's public filings conformed with the federal and state laws;

Engaging in a fraud upon the investment community by drafting, disseminating, or approving of the public dissemination of Provident's false financial statements and press releases and other public statements which were materially false and misleading and failed to disclose adverse information about, *inter alia*, the Company's true financial and operational condition and business prospects; and

Failing to sue to recover the millions of dollars in illegal insider trading proceeds obtained by Company insiders who traded on non-public adverse information and for failing to institute insider trading policies to prevent the future usurping of corporate opportunities and insider trading.

88. The Individual Defendants, as a result of the substantial financial benefits they received and continue to receive as a result of their positions at Provident, engaged in and/or aided and abetted and/or acquiesced in the wrongful actions complained of herein and resolved all conflicts of interest in favor of themselves in order to protect and preserve their positions with Provident and the financial benefits that flow therefrom.

89. In order to facilitate and to attempt to conceal their wrongdoing, the Individual Defendants, and particularly the Audit Committee, have caused Provident to maintain an inadequate system of internal financial and accounting controls such that Provident's financial statements did not reflect the true condition of the Company.

90.     As a result of the Individual Defendants' wrongful and illegal actions, including their abuse of control and participation in the fraudulent scheme, defendants' violations of state and federal laws, and defendants' failure to maintain a system of internal financial and accounting controls adequate to ensure that the financial statements issued by Provident were true and correct in all material respects, Provident has suffered considerable damage to, and drastic diminution in, the value of its assets, goodwill and reputation in the financial community.

91.     Provident will expend significant sums of money as a result of the illegal and improper actions described above.  Such expenditures will include but are not limited to:

Costs incurred as a result of settlements and judgments related to defendants' violation of state and federal laws;

Costs incurred to carry out internal investigations including having to hire an independent accounting firm, including legal fees paid to outside counsel; and

Costs and legal fees for defending Provident, its officers and its directors against private litigation arising from the illegal and improper conduct alleged herein.

## THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

92.     The conduct of Provident's directors and officers complained of herein involves a knowing and/or reckless culpable violation of their obligations as corporate officers and directors, the absence of good faith on their part, a reckless disregard of their fiduciary duties to the Company and its shareholders in which they should have been aware or should have been aware of a risk of serious injury to the Company.  As a result of the foregoing acts of gross mismanagement and breach of fiduciary duty, Provident has been damaged in excess of several millions of dollars.

93.     The Individual Defendants, in derogation of their responsibilities to Provident, failed to properly manage the affairs of Provident and its subsidiaries and failed to protect the interests of Provident and its shareholders.  The Individual Defendants failed to adequately exercise control as required by law, failed in significant measure to fully inform themselves of the affairs of Provident

and its subsidiaries, failed to adequately involve themselves in decision-making and failed to establish adequate internal controls over management and the affairs of Provident.

94.     The Individual Defendants owed to the Company the highest duty of loyalty and honesty which requires, at a minimum, conducting the Company's affairs in a lawful manner. The Individual Defendants knowingly and/or recklessly and/or in the absence of good faith breached their fiduciary duties to Provident by, *inter alia*, failing to establish internal controls sufficient to insure that the Company's business was carried on in a careful manner and that its reputation and financial assets were preserved. The Individual Defendants further breached their fiduciary duties by failing to disclose to the Company and to its shareholders those facts and circumstances concerning the wrongful conduct complained of herein, which the Individual Defendants had a fiduciary duty to disclose. To discharge their duties to Provident and its shareholders, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of Provident and its subsidiaries. Specifically, they were required, among other things:

> To manage, conduct, supervise and direct the business and affairs of Provident and its subsidiaries in accordance with applicable law and the Company's charter and bylaws;

> To neither violate, nor knowingly and/or recklessly permit any officer, director, or employee of Provident to violate applicable federal laws, rules and regulations;

> To exercise reasonable control and supervision over the Company's officers and employees;

> To maintain a proper division of authority and responsibility among the Company's officers and directors so as to prevent the dominance of any officer or director in the conduct of its business and affairs;

> To exercise reasonable care in evaluation of the prudence and soundness of policies and practices proposed to be undertaken by Provident;

> To ensure that Provident did not engage in unsafe, imprudent, or unsound practices and to become and remain informed as to how the Company and its subsidiaries and units were, in fact, operating;

- 40 -

Upon receiving notice or information of an unsafe, imprudent or unsound practice, to make a reasonable investigation in connection therewith, and to take steps to correct that condition or practice; and

To act in good faith, in the best interests of the Company, and with the care that an ordinary prudent person would have used under similar circumstances.

95.     The Individual Defendants, acting directly or indirectly, have violated their duty to exercise management stewardship of the Company, in part by failing to provide adequate internal controls as well as by failing to conduct Provident's business in a careful and prudent manner.

96.     The Individual Defendants acting either directly or indirectly have failed to devise and maintain an adequate system of internal financial and supervisory controls sufficient to provide reasonable assurances that the Company's assets would be safeguarded, its transactions would be executed in accordance with management's general or specific authorization, and its business would be conducted in a careful and prudent manner and its financial results reported in accordance with GAAP.  As a result of the lack of such adequate controls, repeated wrongful and illegal acts have occurred, to the great detriment of and harm to Provident.

97.     As a direct and proximate result of these failures on the part of the Individual Defendants to establish adequate internal controls, and the other wrongful acts attributed to them herein, Provident has suffered damages as set forth herein and has been exposed to enormous potential liability.

## DERIVATIVE ALLEGATIONS AND DEMAND FUTILITY

**Plaintiffs Are Fair And Adequate Representatives**

98.     Plaintiffs bring this action derivatively in the right of and for the benefit of Provident to redress injuries suffered and to be suffered by the Company as a direct result of the breaches of fiduciary duties, gross mismanagement, and waste of corporate assets by defendants.  Provident is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

99.     Plaintiffs will adequately and fairly represent the interests of Provident and its shareholders in enforcing and prosecuting the rights of the Company. Plaintiffs were shareholders at the times complained of herein and continue to hold such shares.  Plaintiffs are represented by qualified counsel with substantial experience in corporate governance litigation of this nature.

100.    Plaintiffs' claims are typical and they have no antagonistic interests with other Provident shareholders and plaintiffs have no conflicts of interests and will therefore fairly and adequately represent the interests of other similarly situated Provident shareholders.

101.    This shareholders' derivative action is brought to remedy violations of Ohio law.  The Company is incorporated in Ohio, hence, Ohio statutory and common law governs and controls any and all legal issues in this action except as to those allegations pertaining to the Sarbanes-Oxley Act of 2002.

**Demand On The Provident Board Of Directors To Bring This Action Would Be Futile**

**All Of The Current Director Defendants Are Alleged To Have Participated In The Wrongs Alleged Herein And To Have Personally Benefited Therefrom**

102.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

103.    It would be futile to require plaintiffs to issue a demand to the Current Director Defendants requesting them to take action against themselves and certain Provident executives for their intentional and/or reckless conduct as alleged herein.  Not only would this require them to investigate and bring claims against themselves for their own misconduct, but their actions to date prove conclusively that they will not take action.

104.    As set forth below in particular detail, and at ¶¶25-30 herein, demand is excused because this Consolidated Complaint alleges with particularity that all of the Current Director Defendants (comprising the entire Provident Board when this action was filed) intentionally and/or recklessly and/or in the absence of good faith breached their fiduciary duties by failing to oversee

Provident's most basic and fundamental financial controls. Each of the Current Director Defendants at the time of the filing of the initial complaint (Messrs. Cook, Grote, Hoverson, Pedoto, Peerless, and Steger) are defendants and each is alleged to have participated in the unlawful acts alleged herein.

105.    As detailed herein and below, all or at the very least, a majority of the Current Director Defendants participated in, encouraged, sponsored or approved many of the acts and omissions or were on notice of and/or recklessly and/or in the absence of good faith disregarded the wrongdoing complained of herein. Each Current Director Defendant directed or permitted Provident to engage in the wrongful acts complained of herein and to cover up their mismanagement of Provident's affairs in connection with the Company's accounting which were known to defendants at all time relevant to the allegations raised herein. Consequently, each Director has been implicated in direct active misconduct causing harm to Provident. By actively participating in or failing to disclose the above-mentioned activities, the Current Director Defendants violated their fiduciary duties owed to the Company and its shareholders.

106.    Additionally, the members of the Audit Committee (Defendants Cook, Grote, Steger and Peerless) and Executive Committee (Defendants Hoverson, Pedoto and Steger) had a responsibility to maintain the integrity of Provident's internal audit functions and fiduciary activities, assuring that Provident's internal controls were adequate. The wrongful activities alleged herein, occurred, in whole or in part, because the Company's internal and supervisory controls were wholly inadequate. The members of the Audit and Executive Committee knew that the supervisory and monitoring controls for the Company were inadequate, that there were no internal controls and they thereby knowingly or recklessly permitted the alleged misconduct to take place; in other words, they knew of the misconduct described herein, permitted it to occur and deliberately looked the other way.

107.    Indeed, a majority of the Board are members of the Audit Committee and specifically participated in the wrongs alleged herein and breached their fiduciary duties by, including but not limited to: causing the Company to violate GAAP; causing the Company to issue false and misleading financial statements; causing the Company to violate its own Audit Charter; and by failing to make any effort to establish and maintain adequate internal accounting controls for Provident to ensure the Company's financial results were calculated and recorded in accordance with GAAP.  This all occurred despite the fact the Audit Committee met 33 times between 1998-2002 alone.  Thus, because the Audit Committee, a majority of the Board, are defendants and alleged to have participated in the wrongs alleged herein, demand is excused on this basis alone.

108.    Additionally, as discussed above, Current Director Defendants Cook, Grote, Hoverson, Peerless and Steger benefited by the wrongs alleged herein by engaging in self-dealing insider selling during the Relevant Period while the Company's stock was artificially inflated as a result of the accounting irregularities described herein. These directors would never authorize a suit against their fellow directors because it would bring scrutiny to their own stock sales.

109.    Defendants Hoverson, Pedoto, and Steger, as members of the Executive Committee, had the legal responsibility to monitor and assure Provident's day-to-day compliance with all applicable laws, rules and regulations.  Despite their knowledge or reckless disregard of Provident's improper management of its operations and financial condition, these defendants knowingly and/or recklessly failed to take appropriate corrective or preventive steps.

110.    Defendant Hoverson participated by engaging in massive insider selling, and as discussed below, by virtue of his status as CEO, violated the Sarbanes Oxley Act as detailed below by signing off on the false financial statements during the Relevant Period.  Moreover, as a Director, President and CEO and Chairman of the Executive Committee, Mr. Hoverson, knew that the supervisory and monitoring controls for the Company were inadequate, that there were no internal

controls and they thereby knowingly or recklessly permitted the alleged misconduct to take place; in other words, he knew of the misconduct described herein, permitted it to occur and deliberately looked the other way.

111.   Likewise, defendant Pedoto was a director of Provident and a member of the Executive Committee and Chairman of the Compensation Committee.  As a director and a member of the Executive and as Chairman of the Compensation Committee, Mr. Pedoto knew that the supervisory and monitoring controls for the Company were inadequate, that there were no internal controls and thereby knowingly or recklessly permitted the alleged misconduct to take place; in other words, he knew of the misconduct described herein, permitted it to occur and deliberately looked the other way.

112.   The acts complained of herein by the Current Director Defendant constitute violations of law and breaches of the fiduciary duties owed by Provident's Board of Directors and these acts are incapable of ratification.

113.   Futility of demand on the Current Director Defendants to bring this action is further evidenced by the fact that Provident has been exposed to significant losses, yet the Current Director Defendants have taken no action against themselves or other present or former employees of the Company who were responsible for that wrongful conduct in an attempt to recover for the Company any part of the damages the Company suffered thereby and, in fact, have permitted defendants to continue to be paid huge sums in order to conceal their complicity in this disaster.  Five of the six Current Director Defendants also violated their fiduciary duties by engaging in self-dealing insider sales, as detailed here in at ¶¶25-30 and 191, while the Company's stock was artificially inflated as a result of the wrongs complained of herein.

114.   Therefore, as all the Current Director Defendants are defendants in this action; are all alleged with particularity to have participated in the unlawful acts alleged herein (or at the very least

- 45 -

the Audit Committee and thus a majority of the Board); and benefited by the wrongs alleged herein by engaging in self-dealing insider trading when they knew, or should have known, the Company's stock was artificially inflated, demand is excused.

**Members of the Audit Committee and Compensation Committee, Comprising a Majority of the Board, Have Already Confirmed Their Unwillingness to Prosecute These Claims**

115.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

116.    On April 30, 2003, after the second restatement, Provident filed its annual Proxy Statement.  While admitting that the Sarbanes Oxley Act of 2002 required that bonuses and insider stock sales proceeds obtained by CEO's and CFO's be returned if paid for years that were ultimately restated based on financial results which were later determined to be false when issued, Provident's Compensation Committee, consisting of defendants Pedato, Grote and Peerless, refused to require disgorgement of the bonuses previously paid to the CEO and the CFO.  Moreover, these defendants paid the bonus they had calculated for fiscal 2002's results, despite the restatement, ***concluding that the misstatements were "unintentional"*** (emphasis added):

> ### *Subsequent Developments*
>
> After the Committee had made its decisions concerning salaries, bonuses and stock option awards as described above, Provident's management discovered errors had been made in the accounting for certain auto lease transactions. Management's discovery of the accounting errors led to a restatement of Provident's operating results for years 1997 through 2002 that was publicly announced on March 5, 2003. Provident's Audit Committee, through legal counsel, then engaged the accounting firm of PricewaterhouseCoopers LLP to conduct an independent review of the restatement.  The Board of Directors as well as Provident's management were subsequently advised that the accounting errors that led to the restatement were unintentional. On April 15, 2003, Provident announced an additional restatement of operating results for years 1994 through 2002. The additional restatement was attributed to a reclassification of auto leases from direct finance leases to operating leases that was required as a result of Provident's determination that its auto leases did not meet accounting standards required for direct finance lease accounting treatment. The restatements are described in Provident's Form 10-K for 2002. ***The Committee reviewed all of these subsequent developments and also took into account the advice given to the Board of Directors that the accounting errors that led to the initial restatement were unintentional. As a result of its review, the***

***Committee confirmed its prior decisions concerning salaries, bonuses and stock option awards.*** (emphasis added).

117.    Similarly, the Audit Committee, now comprised of defendants Steger, Cook and Grote, decided to re-engage Ernst & Young as Provident's independent auditor for 2003, despite the fact that Ernst & Young's accounting for 1994 - 2002 was grossly inaccurate and improper and has now exposed the Company to millions of dollars in potential liability.  The Audit Committee also disregarded the fact that Ernst & Young did not even catch all their errors in the first restatement and it was not until PricewaterhouseCoopers was engaged to reaudit the restatement that an additional $44 million error was detected.  In re-engaging Ernst & Young, the members of the Audit Committee consciously disregarded the fact that each year the Company's non-audit fees paid to Ernst & Young have substantially outweighed its audit fees and the perverse effect this had on Ernst & Young's audit to require compliance with accounting rules and regulations which would have jeopardized Ernst & Young's bigger interest in obtaining the non-audit fees management was engaging them for. These defendants have chosen to engage Ernst & Young, not in the best interests of Provident, but in order to protect themselves and the other defendants from the further scrutiny that hiring new independent auditors could entail.

118.    As the members of the Audit Committee and the Compensation Committee comprise a majority of Provident's board, and in fact include ***all board members except Defendant Hoverson, the primary wrongdoer***, their actions in (i) re-engaging Ernst & Young, despite its monumental errors, and (ii) determining that the accounting fraud was "unintentional" so that they could pay bonuses in 2002, demonstrate that they have already drawn their conclusions concerning the merit of these allegations.  Their actions demonstrate that they are not willing to act to protect Provident and that they will instead protect the interests of the defendants named herein.

**The Current Director Defendants Failed to Fully Inform Themselves to the Extent Reasonably Appropriate under the Circumstances**

119.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

120.    The Current Director Defendants failed to place sufficient controls and procedures in place to prevent harm to the Company. They allowed the accounting irregularities to go on for eight years eventually forcing the Company to restate twice, encompassing an eight-year period, and representing one of the longest restatement periods in recent U.S. business history.  The Current Director Defendants, and especially the Audit Committee (comprising a majority of the Board) failed in significant measure to fully inform themselves of the affairs of Provident, failed to adequately involve themselves in decision-making and failed to establish adequate internal controls over management and the affairs of Provident particularly with respect to the Company's financial statements and its financial reporting process.  Again, this occurred despite the fact that the Audit Committee met 33 times between 1998-2002 alone.

121.    The sustained and systematic failure of the Current Director Defendants to exercise oversight and to reasonably inform themselves to the extent reasonable under the circumstances, especially given that the failure involves a scheme of such significant magnitude and duration (eight years) which went undiscovered by the directors, demonstrates demand is futile.

**The Current Director Defendants Are Not Protected by the Business Judgment Rule**

122.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

123.    During the Relevant Period, the Current Director Defendants caused the Company to issue numerous false and misleading financial statements in violation of GAAP. The fact that Provident restated its financial statements for fiscal 1994 through 2002 is an admission that the

financial statements originally issued were false when issued and that the overstatement of revenues and income was material.

124.    Because the dissemination of false and misleading financial statements can never be deemed to be the product of a valid exercise of business judgment, demand is excused.

125.    Furthermore, the Current Director Defendants' knowing participation in, conspiracy, and/or aiding and abetting of the unlawful activities alleged herein were not – and could never be – the product of a valid exercise of business judgment and the wrongful activities at issue in this shareholders derivative case are not sheltered from scrutiny by the so-called "business judgment rule" because:

> Provident has been exposed to significant losses due to the Company's illegal scheme to hide the true financial and operational condition of the Company in order to support the value of their stock, yet the Current Director Defendants have taken no action against themselves or other present or former employees of Provident who were responsible for that wrongful conduct in an attempt to recover for the Company any part of the damage Provident suffered thereby;

> The conduct of the defendants and resulting harm to Provident resulted from an obvious and prolonged failure to exercise oversight or supervision by the Board of Directors;

> The acts complained of are wrongful and the expenditure of funds complained of constitute violations of fiduciary duties owed each member of the Board of Directors of Provident; and, therefore, these acts are incapable of ratification;

> The acts complained of herein constitute violations of law and breaches of the fiduciary duties owed by the Director Defendants to Provident and its shareholders and these acts are incapable of ratification; and

> The acts complained of herein are wrongful and the expenditure of funds complained of constitute a waste of Provident's corporate assets and, thus, are acts incapable of ratification.

**The Current Director Defendants Are Beholden to and/or Controlled by the Lindner Family Who Will Not Bring Suit**

126.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

127. Carl H. Lindner, Jr., is the Chairman of the Board, CEO, founder and principal shareholder of American Financial Group, Inc. ("AFG"). Mr. Lindner's sons, Carl H. Lindner, III, S. Craig Lindner, and Keith E. Lindner are each also directors of AFG and, along with their father, are also directors of subsidiaries of AFG, including American Financial Corporation ("AFC"). Mr. Lindner, along with his sons and trusts for their benefit (collectively the "Lindner Family"), are the beneficial owners of approximately 44% of AFG's common stock, and share with AFG voting and dispositive power with respect to the shares of Provident Common Stock beneficially owned by AFG. The Lindner Family and AFG own over 40% of the Provident Common Stock (the Lindner Family and AFG are collectively referred to hereinafter as Provident's "Principal Shareholders"). The Lindner Family and their AFG empire are therefore the Principal Shareholders and controlling persons of Provident and members of the Lindner Family are the principal owners of Provident.

128. The Lindner Family and their AFG empire are the Principal Shareholders and controlling persons of Provident and members of the Lindner Family, as a practical matter, control and dominate the process by which directors are selected for nomination or renomination to the Board.

129. During the Relevant Period, the Lindner Family disposed of millions of dollars worth of Provident stock.

130. Provident and AFG have a long-standing relationship and do substantial business with each other. Provident receives substantial fees from AFG in connection with certain arrangements between the companies, including, but not limited to:

Receiving approximately $852,000 from AFG from 1999 to 2002 in connection with an expense sharing arrangement between the companies for a cafeteria operated by Provident for the employees of both companies;

A subsidiary of Provident also leases equipment to subsidiaries of AFG for which Provident does, and has over the last years, received substantial fees. Provident was paid an aggregate of $805,000 during 2001 alone; and

Subsidiaries of Provident Bank have entered into various automobile leases and equipment leases with AFG for which AFG made aggregate payments on the leases of over $3.4 million for the years 1998 through 2001 alone.

131.    In addition, AFG for many years received substantial fees from Provident in connection with certain arrangements between the companies, including, but not limited to the following:

AFC, a subsidiary of AFG, provides security guard and surveillance services at Provident's main office, for which Provident paid $792,000 for the years 1995 through 2002;

Provident leases its main banking and corporate office from a trust for the benefit of a subsidiary of AFG. During 1995, the lease agreements were rewritten and extended to the year 2010. Provident paid rent under the leases of approximately $20,127,000 from 1995 through 2002;

A subsidiary of AFG has provided payroll processing services to Provident for which Provident has paid significant fees;

AFG provided record retention services for Provident for which Provident was charged $28,000 in 2001 and $114,000 in 2002; provided software products for which Provident was charged $44,000 in 2001; and provided property and liability insurance which Provident was charged $612,000 in 2002; and

Provident purchased software used in connection with its Year 2000 Conversion project from a subsidiary of AFG, for which Provident was charged $163,500 in 1997.

132.    Provident also leases branch locations, ATM locations and equipment from its Principal Shareholders and their affiliates, for which it was charged rentals totaling approximately $1,026,000 from the years 1995 through 1998.

133.    Certain affiliates of Provident's Principle Shareholders have for many years sustained substantial investments in the commercial paper of Provident. Fox example, the average month-end commercial paper balances for the Principal Shareholders (including commercial paper held by corporations they control, members of their immediate family and trusts for their benefit) for 2002 alone were as follows: Carl H. Lindner, $10,115,000; Keith E. Lindner, $6,646,000; siblings of Carl

H. Lindner, $2,588,000. Substantial investments in Provident's commercial paper has been made by the Principal Shareholders dating back, to at least, 1995.

134.    Provident Bank also has, from at least 1995 though 2002, extended substantial loans and lines of credit to Provident's Principal Shareholders.  During 2002 alone, the highest month-end outstanding balances of loans to Principal Shareholders and their related interests were as follows: AFG, $1,643,000; Carl H. Lindner, Jr., $2,854,000; siblings of Carl H. Lindner, Jr., $13,302,000; Keith Lindner, $62,000; and S. Craig Lindner, $2,270,000.

135.    Provident and AFG also have other business entanglements that would prevent the Lindners from permitting the board members they control from bringing suit concerning these allegations.  Most notably, Provident and AFG both share the same independent auditor, Ernst & Young, the firm performing the grossly inaccurate and improper accounting that caused the massive restatements exposing the Company to millions in potential liability.  AFG Director Theodore Emmerich served as the managing partner of the Cincinnati office of Ernst & Young (previously known as Ernst & Whinney).  Due to the substantial inter-company transactions between Provident and AFG, Ernst & Young transferred information between the two companies and the Lindners knew or should have known that Provident's financial results were overstated, but sold stock at inflated prices anyway.  The Lindners would not support bringing the allegations alleged herein because it would bring scrutiny of their own transactions with Provident and in Provident stock.  The Lindners control the entire Provident Board via their stock ownership and as they dominate and control the entire Board, demand on any Board member to bring suit would be futile, especially since it would require the Lindners to agree to suing Ernst & Young, which they will not do since Ernst & Young also serves as the independent auditor for AFG.

136.    Provident and AFG also share the same legal counsel, Keating, Muething & Klekamp.  In addition, Mark Magee, Provident's Vice President, Secretary, and General Counsel,

who has been the Company's General Counsel since 1985, was formerly a member of the legal department of AFC.

137.    Certain of the Provident Directors also have direct financial dealings with the Lindner family.  For example, Director Defendant Pedoto has served as President of JLM Financial, Inc., a financial consulting firm.  Mr. Carl Lindner, Jr. and AFG are substantial clients of JLM.  Defendant Pedoto has engaged in other financial transactions with Mr. Lindner, including purchasing Mr. Linder's 26.7% interest in Circle K Corporation in 1992.

138.    Based on the foregoing, the Current Director Defendants are controlled by and/or beholden to the Lindner Family.  As a result, none of the Current Director Defendants would institute a suit against their fellow Directors.

**The Current Director Defendants Are Neither Independent Nor Disinterested**

139.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

140.    The Current Director Defendants cannot be relied upon to reach a truly independent decision as to whether to commence the demanded legal actions against themselves and the officers, employees and/or consultants responsible for the misconduct alleged in this Consolidated Complaint because, *inter alia*, the entire Board of Directors was totally dominated by defendants who were personally and directly involved in the misconduct alleged, each of whom approved all of the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede.  This domination of the Board of Directors by these defendants has impaired its ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether or not to accept plaintiffs' demands.

141.    In order to bring this action for breach of their fiduciary duties, the members of Provident's Board of Directors would be required to sue themselves and/or their fellow Directors

and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do. Therefore, the Current Director Defendants would not be able to vigorously prosecute any such action.

142. The members of Provident's Board of Directors receive payments, benefits and other emoluments by virtue of their Board membership and their control of Provident. Thus, they have benefited from the wrongdoing alleged herein and have engaged in such conduct in order to preserve their positions of control and the perquisites thereof, and are, therefore, incapable of exercising independent objective judgment in deciding whether or not to bring this action. The Board members also have close personal and business ties with each other and are, consequently, interested parties who cannot in good faith exercise independent business judgment to determine whether or not to bring this action against themselves.

143. All of the Current Director Defendants (or at the very least a majority of the Board) are subject to the following prejudicial entanglements which illustrate they are neither disinterested nor independent:

### a. Defendant Cook

144. Defendant Cook is directly interested because he is a member of the Audit Committee and directly participated in the wrongs alleged herein. Mr. Cook is also interested because he engaged in insider trading as alleged in ¶26. Defendant Cook would never institute a suit against his fellow directors because it would bring scrutiny to his own stock sales. In addition, in April 2001, Mr. Cook retired as President and Chief Executive Officer of Health Alliance of Greater Cincinnati, which included, *inter alia*, the Jewish Hospital, the same hospital where defendant Dr. Peerless is Chief Emeritus of the Otolaryngology Department.

### b.     Defendant Grote

145.     Defendant Grote is directly interested because he is a member of the Audit Committee and directly participated in the wrongs alleged herein.  Mr. Grote is also interested because he engaged in insider trading as alleged in ¶27.  Mr. Grote would never institute a suit against his fellow directors because it would bring scrutiny to his own stock sales.  Defendant Grote is also neither disinterested nor independent because he served as Chairman of the Compensation Committee which establishes salaries, bonuses and stock option awards for executive officers on an annual basis, including Defendant Hoverson.  Thus, Mr. Grote would never institute a suit against Mr. Hoverson because it would further implicate him in the wrongs complained of herein.

### c.     Defendant Hoverson

146.     Defendant Hoverson is interested because he was Provident's President and CEO and as a result of his status as CEO violated the Sarbanes Oxley Act as detailed below by signing off on the false financial statements during the Relevant Period.  Mr. Hoverson is also interested because he served on the Executive Committee and knew that the supervisory and monitoring controls for the Company were inadequate, that there were no internal controls and they thereby knowingly or recklessly permitted the alleged misconduct to take place. Defendant Hoverson is also interested because he engaged in massive insider trading as alleged in ¶25.  Mr. Hoverson would never institute a suit against his fellow directors because it would bring scrutiny to his own stock sales.  Defendant Hoverson is also interested because his salary, bonus, and stock options were determined by fellow board members who were on the Compensation Committee.  Defendant Hoverson would never institute a suit against his fellow directors who approved his salary and other benefits.  Moreover, the principal professional occupation of Mr. Hoverson is his employment with Provident, pursuant to which he receives and continues to receive substantial compensations and other benefits. Specifically, from 1997 to 2002, Provident paid Defendant Hoverson in excess of $3.4 million in

salary, $2.4 million in bonuses and other compensation, and granted him 584,500 options to purchase Provident stock. Accordingly, Mr. Hoverson lacks independence from defendants Grote and Peerless, who are not disinterested nor independent, due to their insider sales, and who exert influence over defendant Hoverson's compensation by virtue of their control of the Compensation Committee. This lack of independence renders Mr. Hoverson incapable of impartially considering a demand to commence and vigorously prosecute this action.

### d. Defendant Pedoto

147. Defendant Pedoto is also neither disinterested nor independent because he served on the Compensation Committee which establishes salaries, bonuses and stock option awards for executive officers on an annual basis, including defendant Hoverson. Thus, Mr. Pedoto would never institute a suit against Hoverson because it would further implicate him in the wrongs complained of herein. Mr. Pedoto is also interested because he served on the Executive Committee and knew that the supervisory and monitoring controls for the Company were inadequate, that there were no internal controls and they thereby knowingly or recklessly permitted the alleged misconduct to take place. Defendant Pedoto has also served as President of JLM Financial, Inc., a financial consulting firm, since 1990. Mr. Carl Lindner, Jr., Provident's 40% controlling-shareholder, and AFG are substantial clients of JLM Financial, Inc. Mr. Pedoto has engaged in other financial transactions with Lindner, including purchasing Linder's 26.7% interest in Circle K Corporation in 1992. As Mr. Lindner and his family are Provident's controlling shareholders and sold substantial stock during the Relevant Period, defendant Pedoto could not consider a demand to sue based on the allegations contained herein because it would jeopardize Mr. Pedoto's relationship with Provident's controlling shareholder.

### e. Defendant Peerless

148. Defendant Peerless is directly interested because he was a member of the Audit Committee during the Relevant Period and directly participated in the wrongs alleged herein. Dr.

Peerless is also interested because he engaged in insider trading as alleged in ¶29. Defendant Peerless would never institute a suit against his fellow Directors because it would bring scrutiny to his own stock sales. Defendant Peerless is also neither disinterested nor independent because he served on the Compensation Committee which establishes salaries, bonuses and stock option awards for executive officers on an annual basis, including Defendant Hoverson. Thus, Dr. Peerless would never institute a suit against Hoverson because it would further implicate him in the wrongs complained of herein. In addition, Dr. Peerless is Chief Emeritus of the Otolaryngology Department of Jewish Hospital, the same hospital which is a part of the Health Alliance of Greater Cincinnati, which prior to April of 2001, Defendant Cook served as President and Chief Executive Officer. Thus, Dr. Peerless would not institute a suit against his fellow Director Cook.

### f. Defendant Steger

149. Defendant Steger is directly interested because he is a member of the Audit Committee (Chairman) and directly participated in the wrongs alleged herein. Mr. Steger is also interested because he engaged in insider trading as alleged in ¶30. Mr. Steger would never institute a suit against his fellow directors because it would bring scrutiny to his own stock sales. Defendant Steger is also interested because he served on the Executive Committee and knew that the supervisory and monitoring controls for the Company were inadequate, that there were no internal controls and they thereby knowingly or recklessly permitted the alleged misconduct to take place. Defendant Steger has been the President of the University of Cincinnati since 1984 and is on the Board of Trustees of the University of Cincinnati Foundation. Provident provides substantial financial assistance to the University and is described as the University's "Marquee Sponsor." In addition, the Lindner family provides substantial financial assistance to the University. Indeed, Richard E Lindner has made significant contributions to the University, including recently committing $10.2 million to the University's Varsity Village athletic facilities that will bear his

name.  In addition, Carl H. Lindner, Jr. is an Honorary Trustee to the University of Cincinnati Foundation.  As such, it would jeopardize defendant Steger's financial interests to authorize a suit against Provident's CEO and Board of Directors.

**The Current Director Defendants' Conduct Was So Egregious on its Face That  It Is Not Protected by The Business Judgment Rule**

150.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

151.    The Current Director Defendants' conduct was so egregious on its face that it could not have been the product of sound business judgment.  The accounting irregularities alleged herein were covered-up and/or went undiscovered for eight years eventually resulting in one the longest, if not the longest, restatement periods in U.S. business history.  Had the Current Director Defendants, and particularly the Audit Committee, had adequate internal controls in place, the Company would not be subject to the damages sustained as alleged herein.  Thus, the Current Director Defendants' conduct was so egregious on its face that it could not have been the product of sound business judgment.

152.    In addition, as a result of their conduct, the Current Director Defendants face a substantial likelihood of liability in connection with their intentional and/or reckless failures to ensure that Provident had adequate internal controls and complied with applicable laws especially with their knowledge or acquiescence in Provident's repeated misrepresentations to the financial markets.

153.    As specified in detail herein, the Current Director Defendants were, or at the very least should have been aware, aware of critical facts regarding the Company's accounting and that the Board was engaging in business practices that violated its fiduciary obligations to the shareholders.

154. Despite their knowledge of these facts, the Current Director Defendants intentionally and/or recklessly allowed the Company to disseminate false and misleading financial information to the investing public.

155. The Current Director Defendants undertook this course of conduct with intentional and/or reckless breach of their fiduciary duties because they were afraid that taking the drastic action that was necessary to correct and address the severe lack of any internal controls would: (a) harm the market price of Provident stock; (b) result in the loss of goodwill in the investing community; and (c) jeopardize their personal reputations and financial interests.

**Insured Versus Insured Exclusion**

156. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

157. Upon information and belief, the Current Director Defendants are protected against personal liability for their acts of waste and breach of fiduciary duty alleged in this Complaint by very substantial directors' and officers' liability insurance, which they caused the Company to purchase for their protection and which has been paid for with corporate funds (*i.e.,* monies belonging to Provident's shareholders). Upon information and belief, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, however, the applicable liability insurance policies covering defendants in this case contain provisions which eliminate coverage for ***any*** action brought directly by Provident against these defendants; such provisions are known, *inter alia*, as the ***"insured versus insured exclusion."*** As a result, if Provident's Directors were to sue themselves or certain of the Company's officers, there would be no applicable insurance protection and, thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance

coverage exists and will provide a basis for the Company to effectuate a recovery for the multi-million dollar damages it has sustained.

## AIDING AND ABETTING AND CONCERTED ACTION

158.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties as alleged herein.

159.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) maintain the Individual Defendants' executive and directorial positions at Provident and the profits, power and prestige which the Individual Defendants enjoyed as a result of these positions; (ii) deceive the investing public, including shareholders of Provident, regarding the Individual Defendants' management of Provident's operations, its financial health and stability, and its future business prospects; and (iii) temporarily inflated the market price of Provident common stock.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

160.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct commencing in 1994 and continuing at least until 2003, to intentionally violate state and federal securities laws, during which time the Individual Defendants caused the Company to make inaccurate statements about Provident's financial performance and future business prospects, thereby allowing Provident's corporate insiders to reap millions of dollars in proceeds from their stock sales.

161.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, abuse of control, and gross mismanagement; to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and to artificially inflate the price of Provident common stock so they could: (i) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained thereby; and (ii) reap substantial personal profits from the sale of Provident common stock at artificially inflated prices.

162.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to make inaccurate statements about the Company's financial performance and future business prospects, which had the effect of artificially inflating the price of Provident common stock.  Each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

163.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## CAUSES OF ACTION

## COUNT I

### (Breach of Fiduciary Duties Against All Individual Defendants)

164.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

- 61 -

165.    The Individual Defendants are fiduciaries of Provident and of all of its public shareholders and owe to them the duty to conduct the business of the Company loyally, faithfully, carefully, diligently and prudently.  A fiduciary duty is the highest duty imposed by law. This count is asserted based upon the Individual Defendants' acts in violation of Ohio common law, which acts constitute breach of fiduciary duty.

166.    Each of the Individual Defendants actively participated in and/or approved the Company's improper claims practices, as alleged herein.  These actions violated the Individual Defendants' fiduciary duties and could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.  The Individual Defendants violated their duty of loyalty to Provident and negligently and/or recklessly and/or intentionally violated their fiduciary duties to the Company and its shareholders.

167.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Provident has sustained damages, as alleged herein.

## COUNT II

### (Derivative Claim for Abuse of Control Against All Individual Defendants)

168.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

169.    The Individual Defendants' conduct constituted an abuse of their ability to control and influence Provident for which they are legally responsible.

170.    By reason of the foregoing, Provident has been damaged and has sustained, and will continue to sustain, substantial damages.

## COUNT III

### (Derivative Claim for Constructive Fraud Against All Individual Defendants)

171.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

172.     As a result of the tortuous conduct described above, the Individual Defendants have made, or aided and abetted the making of, numerous misrepresentations to and concealed material facts from Provident and its shareholders despite the Individual Defendants' fiduciary duties to, *inter alia*, disclose the true facts regarding their stewardship of Provident and defendants' true intentions, and thus have committed and/or aided and abetted constructive fraud.

173.     The public representations discussed above were false and materially misleading as earlier alleged.

174.     As a part of this conspiracy, the defendants actively made or concealed, and/or participated in the making of or aided and abetted the making or perpetration of the concealment of, numerous omissions and misrepresentations of facts regarding Provident to shareholders, as more fully set forth above.  Said representations and statements were untrue and the defendants did not believe them to be true when made, or knowingly, willfully and/or intentionally made them without regard to their truthfulness or aided and abetted the making of said representations.  Said acts by the defendants were fraudulent, oppressive and malicious.

175.     As a direct and proximate result of the foregoing, shareholders and the Company reasonably relied upon the honesty and integrity of the Individual Defendants as corporate officers and directors and were induced to act upon such misrepresentations, and have been damaged, entitling Provident to compensatory and punitive damages.

176.     By reason of the foregoing, Provident has sustained, and will continue to sustain, substantial damage and it is entitled to an award of punitive damages against the defendants.

### COUNT IV

### (Derivative Claim for Gross Mismanagement Against the Individual Defendants)

177.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

178.    As detailed more fully herein, the Individual Defendants each have and had a duty to Provident and its shareholders to prudently supervise, manage and control Provident's operations.

179.    The Individual Defendants by their actions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing the assets of Provident in a manner consistent with the operations of a publicly held corporation.

180.    By subjecting Provident to the unreasonable risk of liability by engaging in the fraud described herein and/or by concealing this fraud and its effect on Provident's profitability, the Individual Defendants breached their duties of due care and diligence in the management and administration of Provident's affairs and in the use and preservation of Provident's assets.

181.    The Individual Defendants caused the Company to engage in this misconduct and were aware of the problems and probable losses associated therewith.  During the course of the discharge of their duties, these defendants knew or should have known of the unreasonable risks, yet these defendants caused Provident to engage in this scheme which these defendants knew had an unreasonable risk of material loss to the Company, thus breaching their duties to both Provident and its shareholders.  As a result, the Individual Defendants grossly mismanaged or aided and abetted the gross mismanagement of Provident and its assets by causing it to perpetrate a fraud which the defendants knew would likely lead to material and substantial restatements and losses.

182.    As a proximate result thereof, Provident has been damaged and will continue to suffer damages, and has sustained and will continue to sustain substantial damage.

## COUNT V

### (Derivative Claim for Waste of Corporate Assets Against the Individual Defendants)

183.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

184.    As a result of the foregoing conduct, the Individual Defendants have caused Provident to waste valuable assets and have subjected the Company to potential material liability for securities fraud, possibly reaching hundreds of millions of dollars in damages as well as significant legal defense fees.

185.    Also, as a result of the foregoing conduct, the Individual Defendants caused Provident to spend Company money on an internal investigation, including hiring another independent auditor after the first restatement. Moreover, the Individual Defendants conscious decision to award stock options during the Relevant Period constitutes waste.

186.    By reason of the foregoing, Provident has sustained substantial damage.

## COUNT VI

### (Unjust Enrichment Against the Individual Defendants)

187.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

188.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Provident.

189.    Plaintiffs, as a shareholders and representatives of Provident, seek restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VII

### (Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information)

190.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

191.    The following illustrates the insider selling by the Insider Selling Defendants:

**Insider Stock Sales from:  January 1, 1994 - April 15, 2003**

| Insider | Date | Shares | Price | Sales Proceeds |
|---------|------|--------|-------|----------------|
| J. Cook | 26-Feb-2002 | 3,375 | $24.000 | $81,000 |
| T. Grote | 22-Apr-2002 | 3,375 | $31.000 | $104,625 |
| R. Hoverson | 20-Jan-98 | 5,000 | $46.880 | $234,400 |
| | 22-Jan-98 | 52,200 | $46.250 | $2,414,250 |
| | 23-Jan-98 | 55,300 | $45.630 | $2,523,339 |
| | 23-Jan-98 | 22,500 | $46.000 | $1,035,000 |
| | 23-Jul-2001 | 21,250 | $34.180 | $726,325 |
| | 24-Jul-2001 | 80,000 | $32.050 | $2,564,000 |
| | | 236,250 | | $9,497,314 |
| M. Magee | 18-Feb-98 | 12,000 | $48.530 | $582,360 |
| | 19-Feb-98 | 1,500 | $48.500 | $72,750 |
| | 26-Mar-98 | 5,824 | $51.750 | $301,392 |
| | 19-Apr-2002 | 6,750 | $31.300 | $211,275 |
| | | 26,074 | | $1,167,777 |
| P. Myers | 09-Feb-98 | 7,500 | $49.130 | $368,475 |
| | 10-Feb-98 | 10,000 | $49.000 | $490,000 |
| | 20-Feb-98 | 33,200 | $48.750 | $1,618,500 |
| | 26-Feb-98 | 6,000 | $50.040 | $300,240 |
| | 27-Feb-98 | 9,000 | $50.500 | $454,500 |
| | 02-Mar-98 | 2,000 | $51.770 | $103,540 |
| | 03-Mar-98 | 1,900 | $52.130 | $99,047 |
| | 04-Mar-98 | 3,200 | $51.790 | $165,728 |
| | 07-Aug-2001 | 45,500 | $31.870 | $1,450,085 |
| | 08-Aug-2001 | 3,000 | $32.100 | $96,300 |
| | 09-Aug-2001 | 11,000 | $31.830 | $350,130 |
| | 10-Aug-2001 | 8,000 | $31.890 | $255,120 |
| | | 140,300 | | $5,751,665 |
| S. Peerless | 14-Dec-98 | 500 | $39.500 | $19,750 |
| | 14-Dec-98 | 232 | $39.380 | $9,136 |
| | 25-Jan-2002 | 1,000 | $23.930 | $23,930 |
| | 25-Jan-2002 | 800 | $23.920 | $19,136 |
| | 25-Jan-2002 | 975 | $23.820 | $23,225 |
| | 25-Jan-2002 | 100 | $23.840 | $2,384 |
| | 25-Jan-2002 | 400 | $23.900 | $9,560 |
| | 25-Jan-2002 | 100 | $23.910 | $2,391 |
| | | 4,107 | | $109,512 |
| J. Steger | 19-Apr-2002 | 575 | $31.250 | $17,969 |
| | 19-Apr-2002 | 2,700 | $31.300 | $84,510 |
| | 19-Apr-2002 | 100 | $31.320 | $3,132 |
| | | 3,375 | | $105,611 |
| | | **416,856** | | **$16,817,503** |

192.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew, or should have known the information described above, and sold Provident common stock on the basis of such information.

193.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Provident common stock.

194.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Provident common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

195.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

196.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Provident common stock on the basis of such information.

## COUNT VIII

**(For Forfeiture of Bonuses and Illicit Profits Against Defendants Hoverson and Carey)**

197.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

198.    Provident's amended form 10-K for the year ending December 31, 2002 indicates that Provident was required to restate previously reported financial results for 1994-2002.

199.    Pursuant to the Sarbanes-Oxley Act of 2002 §304, because Provident was required to prepare an accounting restatement for fiscal years 1998, 1999, 2000, 2001 and 2002 due to material noncompliance with GAAP, as a result of misconduct, with any financial reporting requirement

- 67 -

under the securities laws, Defendant Hoverson, as Provident's CEO and defendant Carey, as Provident's CFO, are required to reimburse Provident for all bonuses or other incentive-based or equity-based compensation, received by them from Provident between 1998 and 2002, as identified in ¶¶25 and 32, and the profits they realized from the sale of Provident securities during that period.

200.    Defendants Hoverson and Carey are also liable to plaintiffs for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of Provident.

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Declaring that the Individual Defendants, and each of them, have committed breaches of their fiduciary duties to Provident;

B.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other violations of law;

C.    Awarding disgorgement in favor of Provident of all bonuses and stock options unjustly received by the Individual Defendants;

D.    Declaring that Defendants Hoverson and Carey are liable under the Sarbanes-Oxley Act of 2002 and requiring them to reimburse Provident for all bonuses or other incentive-based or equity based compensation received by them between 1998 and 2002;

E.    Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

F.    Granting such other and further relief as the Court deems just and proper, including injunctive relief; and

G.    A trial by jury on all issues so triable.

Respectfully submitted,

_/s/Ann Lugbill_
ANN LUGBILL, Esq. (0023632)
2406 Auburn Avenue
Cincinnati, OH 45219
Telephone: (513) 784-1280
Facsimile: (513) 784-1449
_alugbill@choice.net_
**Liaison Counsel and Trial Attorney for Plaintiffs**

_/s/George E. Barrett_
GEORGE E. BARRETT
**Lead Counsel and Chairman of Executive Committee**
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
BARRETT, JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201
Phone: (615) 244-2202
Fax: (615) 252-3798
_Gbarrett@barrettjohnston.com_
_Tmiles@barrettjohnston.com_
_Djohnston@barrettjohnston.com_
Attorneys for Plaintiffs

JAMES G. STRANCH
Plaintiffs' Executive Committee
GERARD STRANCH
BRANSTETTER, KILGORE, STRANCH &
JENNINGS
227 Second Avenue North
Nashville, TN 37201
Phone: (615) 254-8801 Fax: (615) 255-5419
_Jstranch@branstetterlaw.com_
_Gstranch@branstetterlaw.com_

NADEEM FARUQI
Plaintiffs' Executive Committee
SHANE ROWLEY
DAVID LEVENTHAL
FARUQI & FARUQI, LLP
320 East 39th Street
New York, NY 10016
Telephone: (212)983-9330
Facsimile: (212) 983-9331
*Nfarqui@faruqilaw.com*
*Srowley@faruqilaw.com*
*Deleventhal@faruqilaw.com*


**Of Counsel:**

DARREN J. ROBBINS
AMBER L. ECK
MARY K. BLASY
LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
*darrenr@lerachlaw.com*
*ambere@lerachlaw.com*
*maryb@lerachlaw.com*


JURY DEMAND

Plaintiffs hereby request a trial by jury on all claims that may be tried to a jury.

_____/s/Ann Lugbill_____
ANN LUGBILL, Esq. (0023632)

- 70 -

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing to be served, by the electronic filing service and as to those not so registered, by e-mail to co-counsel and by regular U.S. mail, upon the following counsel on this 4th day of November 2004.

_____/s/Ann Lugbill_____
Ann Lugbill, Esq.
2406 Auburn Avenue
Cincinnati, OH   45219
(513) 784-1280; (513) 784-1449 - Fax
Alugbill@choice.net
*Trial Attorney for Plaintiffs and Liaison Counsel*

James E. Burke, Esq.
Jason Cohen, Esq.
KEATING, MUETHING & KLEKAMP
1400 Provident Tower
One East Fourth Street
Cincinnati, OH 45202
Phone: (513) 579-6429
Fax: (513) 579-6457
*Counsel for Defendants*

Pierre H. Bergeron, Esq.
Mark J. Ruehlmann, Esq.
SQUIRE SANDERS & DEMPSEY, LLP
312 Walnut Street, Suite 3500
Cincinnati, OH 45202
Phone: (513) 361-1200
Fax: (513) 361-1201
*Counsel for Defendant Myers*

George E. Barrett, Esq.
Douglas S. Johnston, Jr., Esq.
Timothy L. Miles, Esq.
BARRETT, JOHNSTON & PARSLEY
217 Second Avenue, North
Nashville, TN 37201
Phone: (615) 244-2202
Fax: (615) 252-3798
*Counsel for Plaintiff Plumbers & Pipefitters Local 572 Pension Fund and Lead Counsel ("Executive Committee")*

James G. Stranch, Esq.
BRANSTETTER, KILGORE, STRANCH & JENNINGS
227 Second Avenue, North
Nashville, TN 37201
Phone: (615) 254-8801

Fax: (615) 255-5419
*Counsel for Plaintiff Plumbers & Pipefitters Local 572 Pension Fund and Lead Counsel*
*("Executive Committee")*

Nadeem Faruqi, Esq.
Shane Rowley, Esq.
FARUQI & FARUQI, LLP
320 East 39th Street
New York, NY 10016
Phone: (212) 983-9330
Fax: (212) 983-9331
*Counsel for Plaintiff Berg and Lead Counsel ("Executive Committee")*


Richard L. Norton, Esq.
KATZ, GREENBERGER & NORTON, LLP
105 E. Fourth Street, Suite 400
Cincinnati, OH 45202
Phone: (513) 721-5151
Fax: (513) 621-9285
*Counsel for Plaintiff in* <u>Mays v. Cook</u>,
*Case No. A0302735 (Ham. Cty. Com. Pleas, Taylor, J.)*

Robert I. Harwood, Esq.
Daniella Quitt, Esq.
Jeffrey M. Norton, Esq.
WECHSLER HARWOOD, LLP
488 Madison Avenue
New York, NY 10022
Phone: (212) 935-7400
Fax: (212) 753-3630
*Counsel for Plaintiff in* <u>Mays v. Cook</u>,
*Case No. A0302735 (Ham. Cty. Com. Pleas, Taylor, J.)*

Brian J. Robbins, Esq.
ROBBINS UMEDA & FINK, LLP
1010 Second Avenue, Suite 2360
San Diego, CA 92101
*Counsel for Plaintiffs*

Darren J. Robbins, Esq.
Amber L. Eck, Esq.
Mary K. Blasy, Esq.
LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
*darrenr@lerachlaw.com*
*ambere@lerachlaw.com*
*maryb@lerachlaw.com*